## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DEBORAH M. BOURQUE,

    Plaintiff,


Civil Action No.: 04-12037-WGY

v.

METROPOLITAN LIFE INSURANCE
COMPANY, AIRBORNE EXPRESS LONG
TERM DISABILITY PLAN, AIRBORNE,
EXPRESS, INC.


# EXHIBITS A - F

# TO

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION FOR
## FOCUSED PRE-TRIAL DISCOVERY RELATING TO
## THE SCOPE OF THE ADMINISTRATIVE RECORD

EXHIBIT A



1  Glenn R Kantor, Esq  State Bar No  122643
   Elizabeth K  Green, Esq  State Bar No  199634
2  KANTOR & KANTOR, LLP
   15165 Ventura Boulevard, Ste 400
3  Sherman Oaks, CA 91403
   Tel  (818) 981-1941
4  Fax (818) 981-1943
   E-Mail  gkantor@kantorlaw net
5
   Attorneys for Plaintiff, Wilma Clark
6

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED
BY                    DEPUT
MAR - 1 2005
CLERK, U S  DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

LODGED
'05 FEB 10  AM 9 51

                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA

11  WILMA F  CLARK,                      )  CASE NO  ED CV04-1236 VAP
                                         )  (SGLx)
12                                       )
            Plaintiff,                   )
13                                       )  [PROPOSED] ORDER
      VS                                 )
14                                       )
    METROPOLITAN LIFE INSURANCE          )
15  COMPANY,  HOME DEPOT LONG            )
    TERM DISABILITY PLAN, HOME           )
16  DEPOT MEDICAL PLAN, HOME             )
    DEPOT LIFE INSURANCE PLAN;           )
17  HOME DEPOT PENSION/                  )
    RETIREMENT PLAN,                     )
18                                       )
            Defendants                   )
19                                       )
20

DOCKETED ON CM
MAR - 1 2005
BY            044

21        A Scheduling Conference was held on February 7, 2005, before the Honorable

22  Virginia A  Phillips, U S  District Court Judge, presiding, with Elizabeth K  Green

23  and Glenn R  Kantor, Kantor & Kantor LLP, appearing on behalf of Plaintiff, and

24  Krista L  Mitzel and Lawrence E  Butler, Seyfarth Shaw LLP, appearing on behalf of

25  Defendants

26        The Court ordered that discovery was permissible in this matter regarding

27     1     The number of times that Defendants have utilized the services of the

28           medical reviewer(s) who reviewed Plaintiff's claim for Defendants,

                                         1

1   2   The amounts Defendants paid to the medical reviewer(s) who reviewed
2       Plaintiff's claim, and the amounts paid to those medical reviewer(s) in
3       the three (3) years preceding the review of Plaintiff's claim,
4   3   In the event the medical reviewers were subcontracted by another agency
5       working on MetLife's behalf, the amounts paid by MetLife to the
6       subcontracting company in the three (3) years preceding the review of
7       Plaintiff's claim,
8   4   Any written communications between MetLife and the Plan Sponsor
9       demonstrating that the Plan Sponsor, prior to the purchase of the subject
10      group policy, affirmatively requested that language be included in the
11      group policy delegating discretion upon MetLife to interpret Plan terms
12      and/or to determine eligibility for disability benefits, and,
13  5   In the event no documents exist responsive to category 4 above, all
14      documentation, in either written or electronic form, establishing how the
15      language delegating discretion upon Met Life to interpret Plan terms
16      and/or to determine eligibility for disability benefits came to be included
17      in the subject group policy
18
19
20  Date  February 18, 2005

Honorable Virginia A  Phillips
21                                 U S/ District Court Judge
22
23
24
25
26,
27
28

2

1                          **PROOF OF SERVICE**

2    STATE OF CALIFORNIA        )
                                ) ss
3    COUNTY OF LOS ANGELES )

4          I am employed in the County of Los Angeles, State of California  I am over
     the age of 18 and not a party to the within action, my business address is 15165
5    Ventura Boulevard, Suite 400, Sherman Oaks, California 91403

6          On    February 9,  2005, I served the foregoing document described as
     [PROPOSED] ORDER on the interested parties in this action by serving a copy
7    thereof in a sealed envelope addressed as follows

8    Eric McDonough, Esq                 Krista L  Mitzel, Esq
     Seyfarth Shaw                       Seyfarth Shaw
9    2029 Century Park East, Suite 3300  560 Mission Street, Suite 3100
     Los Angeles, California 90067       San Francisco, California 94105

10
     [xx]  [BY MAIL] I deposited such envelope in the mail at Sherman Oaks,
11         California  The envelope was mailed with postage thereon fully prepaid

12   [XX]  As follows  I am "readily familiar" with the firm's practice of collection and
           processing correspondence for mailing   Under that practice it would be
13         deposited with U S  postal service on that same day with postage thereon fully
           prepaid at Sherman Oaks, California in the ordinary course of business  I am
14         aware that on motion of the party served, service is presumed invalid if postal
           cancellation date or postage meter date is more than one day after date of
15         deposit for mailing in affidavit.

16   []    (BY FACSIMILE)  I faxed such document to the facsimile number above
           following regular business practices
17
     []    (BY PERSONAL SERVICE) I caused such envelope to be delivered by hand
18         to the offices of the addressee

19   [ ]   (BY FEDERAL EXPRESS) I caused such envelope to be delivered by
           Federal Express to the offices of the addressee
20
     []    (STATE)  I declare under penalty of perjury under the laws of the State of
21         California that the above is true and correct

22   [XX]  (FEDERAL) I declare that I am employed in the office of a member of the bar
           of this court at whose direction the service was made
23
           Executed on February 9, 2005, at Sherman Oaks, California
24

25                           _Mildred Schwam_
                             Mildred Schwam
26

27

28

EXHIBIT B

MAY-13-2004 THU 09:42 AM PHILLPS & AN**DEN=0405130FAX043** 16173678787          P. 06

# PHILLIPS & ANGLEY

ATTORNEYS AND COUNSELLORS AT LAW
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
ONE BOWDOIN SQUARE
BOSTON, MASSACHUSETTS 03114
(017) 367-8787

JEFFREY J. PHILLIPS, P.C.
JEFFREY T. ANGLEY, P.C.
JONATHAN M. FERGENSON SP
CHRISTOPHER S TOLLEY
DANIEL TREGER
BRANDY J WITTAN

*Also Admitted in DC and CA

TELECOPIER (017) 387-0002

March 16, 2004

Cynthia P. Eunice
LTD Case Manager
Metropolitan Life Insurance Company
P.O. Box 14590
Lexington, KY 40511-4590

FAX: 866-690-1264
CERTIFIED MAIL
No.7002 2030 0002 2444 8048

Scott M. Northcutt
Executive Vice President Human Resources
DHL Americas
1200 South Pine Island Road, Suite 600
Plantation, FL 33324

FEDERAL EXPRESS

| | |
|---|---|
| Claimant | : Deborah M. Bourque |
| Plan Administrator | : DHL Americas f/k/a Airborne Express (Airborne) |
| Claims Administrator | : MetLifeDisability |
| Policy Holder | : DHL Americas f/k/a Airborne Express |
| Report No. | : 0074632 |
| Claim Number | : 740001310307 |

Dear Ms. Eunice and Mr. Northcutt:

Please be advise that I am counsel to Deborah M. Bourque. Ms. Bourque had been employed by Airborne which is now merged into DHL Americas.

Ms. Bourque intends to submit a comprehensive appeal in connection with MetLife's adverse benefit decision set forth in your letter of October 8, 2003. The one hundred and eighty (180) day period for submitting appeals does not begin to run until such time that MetLife discloses all information that is required under ERISA and the accompanying Department of Labor Regulations. Ms. Bourque would like to submit her appeal as soon as possible, however, MetLife must first disclose all of the information that is required by law.

1

BQ 00792

In the interim, I am requesting that MetLife begin paying benefits to Ms. Bourque immediately. As you are aware, she is suffering from a life threatening illness, and is unable to work in her occupation at this time. Ms. Bourque's medical condition has not improved during the time period that MetLife was paying benefits to her. Although I have not had an opportunity to review the actual plan documents governing Ms. Bourque's entitlement as a beneficiary under the plan, I am relatively certain that the documents do not require that she provide "objective clinical information" that support restrictions and limitations as set forth on page 3 of your October 8, 2003 letter. Many a court has rejected a demand that a claimant furnish objective medical evidence, or the like in order to obtain benefits.  Cook v. Liberty Life Assurance Co. Of Boston, 320 F.3d 11, 21 (1st Cir. 2003)

MetLife is required to state with specificity the reasons for denial, and MetLife is required to state with specificity the nature of the materials that Ms. Bourque should submit in order to appeal the adverse benefit decision. ERISA requires that plans must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133. "First, notice can provide the member with information necessary for him or her to know what he or she must do to obtain the benefit. Second, if the HMO persists in its denial, notice can enable the member effectively to protest that decision." *Juliano v. Health Maintenance Organization of New Jersey, Inc.*, 221 F.3d 279, 287 (2d Cir.2000).

In MetLife's adverse benefit decision letter dated October 8, 2003 reference is made to a review of some of Ms. Bourque's records by a Physician File review (something I interpret to mean a nurse or medical doctor consultant or employee), however, nothing is disclosed regarding that person's qualifications, explicit findings, methodology, or even a list of materials reviewed. ERISA's implementing regulations require that disability denials that rely on "an internal rule, guideline, protocol, or other similar criterion" must set forth the specific criterion relied upon, or state that a copy will be "provided free of charge to the claimant upon request." 29 C.F.R. § 2560.503-1(g)(v)(A). That statement is missing from the October 8, 2003 letter, and the lack of such a statement is a per se violation of the Department of Labor regulations. *Cook v. New York Times Disability Plan*, 2004 WL 203111 (S.D.N.Y. January 30, 2004)). Please provide the information as required under the regulations.

Please consider this letter a formal request under 29 U.S.C. § 1132(c) to obtain copies of:

1.      The Summary Plan Description *and* the plan documents under which Ms. Bourque is a beneficiary and participant of which Airborne, is the administrator and beneficiary under an insurance contract with MetLife.

2.      Proof that the most recent Summary Plan Description for the Airborne Short Term and Long Term Disability Plans had been tendered to Ms. Bourque prior to the time that he sought benefits.

2

BQ 00793

3.      Ms. Bourque seeks copies of all pertinent documents on which MetLife made its adverse benefit decision. MetLife should be aware, that under United States Department of Labor regulations, 29 CFR 2560.503-1(g) "pertinent documents" are:

"in the case of an adverse benefit determination, the notification shall set forth, in a manner calculated to be understood by the claimant—
    (1) The specific reason or reasons for the adverse determination;
    (2) Reference to the specific plan provisions on which the benefit determination is based;
    (3) A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of ther section;
    (4) A statement describing any voluntary appeal procedures offered by the plan and the claimant's right to obtain the information about such procedures described in paragraph (c)(3)(iv) of ther section, and a statement of the claimant's right to bring an action under section 502(a) of the Act; and
    (5) In the case of a group health plan or a plan providing disability benefits--
    (i) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided free of charge to the claimant upon request;
    (ii) If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances,
    or a statement that such explanation will be provided free of charge upon request; and
    iii) The following statement: "You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency.
    (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review."
29 CFR § 2560.503-1(g).

In addition, documents are considered relevant under these regulations, if:
"(m) Definitions The following terms shall have the meaning ascribed to such terms in there paragraph (m) whenever such term is used in ther section:

3

(8) A document, record, or other information shall be considered "relevant" to a
claimant's claim if such document, record, or other information
(i) Was relied upon in making the benefit determination; (ii) Was submitted, considered,
or generated in the course of making the benefit determination, without regard to whether
such document, record, or other information was relied upon in making the benefit
determination;
(iii) Demonstrates compliance with the administrative processes and safeguards required
pursuant to paragraph (b)(5) of ther section in making the benefit determination; or
(iv) In the case of a group health plan or a plan providing disability benefits, constitutes a
statement of policy or guidance with respect to the plan concerning the denied treatment
option or benefit for the claimant's diagnosis, without regard to whether such advice or
statement was relied upon in making the benefit determination." 29 CFR § 2560.503-1

4.    A copy of the MetLife Claims Manual, and each document of the like that assists MetLife
in evaluating claims such as Ms. Bourque.

5.    A complete copy of Ms. Bourque's file in MetLife's possession. Ther must include all
documents and internal MetLife notes, correspondence, e-mail and other data maintained in each
data base or on hard copy. The materials that were tendered to me in your letter of February 11,
2004 appear to be incomplete.

6.    All notices that MetLife is required to provide under ERISA and the regulations as well
as the specific requirements of the applicable Aiborne Short Term and Long Term Disability
Plan.

7.    Would you also provide a description of all additional material or information necessary
for Ms. Bourque to perfect the claim and an explanation of why such material or information is
necessary.

Under section 502 of the Employee Retirement Income Security Act of 1974 as amended,
the failure to provide a Summary Plan Description, and all other documents required to be
disclosed, within thirty days of a written request subjects the violator to a discretionary $110.00 a
day penalty for non-compliance, plus, in some instances attorneys' fees and related costs.

Please feel free to contact me should you have any questions.

Thank you for your courtesy and cooperation with their matter.

Very truly yours,

Jonathan M. Feigenbaum

JMF/hs
cc:   Deborah M. Bourque
L:\LITG\DBOR001\metlife.l3.wpd

4

BQ 00795

EXHIBIT C

# ORIGINAL

1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ------------------------------------------------------X
   JOSEPH PALMIOTTI,
4
                              Plaintiff,
5
                -against-
6
   METROPOLITAN LIFE INSURANCE COMPANY,
7
                              Defendant.
8  ------------------------------------------------------X

9                          DATE: March 10, 2005

10                         TIME: 10:15 AM

11

12              EXAMINATION BEFORE TRIAL of the

13  Defendant, METROPOLITAN LIFE INSURANCE COMPANY, by

14  ROSEMARY HARMON, taken by the Plaintiff, pursuant

15  to Order, held at the offices of Lester, Schwab,

16  Katz & Dwyer, LLP, 120 Broadway, New York, New York

17  10271, before May Jean Yee, a Reporter and Notary

18  Public of the State of New York.

19

20

21

22

23

24

25

2

1

2    A P P E A R A N C E S:

3

         REMER & ASSOCIATES LLC
4                Attorneys for the Plaintiff
                 60 East 42nd Street
5                New York, New York 10165
                 BY: SCOTT M. REMER, ESQ.
6

7        LESTER, SCHWAB, KATZ & DWYER, LLP
                 Attorneys for the Defendant
8                120 Broadway
                 New York, New York 10271
9                BY: ALLAN M. MARCUS, ESQ.

10
                 *              *              *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

3

```
 1

 2

 3          F E D E R A L    S T I P U L A T I O N S

 4

 5

 6               IT IS HEREBY STIPULATED AND AGREED

 7     by and between the counsel for the respective

 8     parties hereto, that the filing, sealing, and

 9     certification of the within deposition shall

10     be and the same are hereby waived;

11

12               IT IS FURTHER STIPULATED AND AGREED

13     that all objections, except as to the form

14     of the question, shall be reserved to the times

15     of the trial.

16

17               IT IS FURTHER STIPULATED AND AGREED

18     that the within deposition may be signed before

19     any Notary Public with the same force and effect

20     as if signed and sworn to before this court.

21

22

23               *     *     *     *

24

25
```

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

4

1
2    R O S E M A R Y    H A R M O N, called as a
3    witness, having been first duly sworn by a Notary
4    Public of the State of New York, was examined and
5    testified as follows:
6    EXAMINATION BY
7    MR. REMER:
8        Q.    What is your name?
9        A.    Rosemary Harmon.
10       Q.    What is your address?
11       A.    5920 Airport Road, Orisknay, New York.
12       Q.    Ms. Harmon, my name is Scott Remer and
13   I represent the plaintiff in this lawsuit.
14            I'm going to be asking you a series of
15   questions today about your role in Mr. Palmiotti's
16   claim.  If I ask you a question and you don't
17   understand it, please let me know and I'll rephrase
18   it for you.  Also the court reporter can't put down
19   gestures, so if the answer is yes or no, say yes or
20   say no, but don't shake your head because she can't
21   record that.
22       A.    Okay.
23       Q.    Why don't we just start off by, if you
24   could, give me a brief synopsis of your educational
25   background.

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

5

```
  1                          HARMON

  2        A.    I have a two-year associate's degree.

  3        Q.    What year was that?

  4        A.    Pardon?

  5        Q.    What year was that?

  6        A.    1991.

  7        Q.    Where is that from?

  8        A.    Herkimer County Community College.

  9        Q.    Is that degree in a particular subject?

 10        A.    Yes.

 11        Q.    What's the subject?

 12        A.    Paralegal.

 13        Q.    How long have you been working at Met

 14   Life?

 15        A.    It's going on ten years.

 16        Q.    Did you start working shortly after

 17   receiving your paralegal degree?

 18        A.    Approximately I'm guessing five years.

 19        Q.    Five years after?

 20        A.    Yes.

 21        Q.    What kind of jobs did you hold before

 22   working at Met Life?

 23        A.    Legal secretary.

 24        Q.    What years did you do that?

 25        A.    '91 till '95 or '6, but I'm not quite
```

6

```
 1                    HARMON
 2    sure.
 3         Q.    Before getting your paralegal degree,
 4    what did you do for a living?
 5         A.    In manufacturing.
 6         Q.    What do you mean?
 7         A.    I worked for GE.
 8         Q.    How many years did you work at GE?
 9         A.    Five.
10         Q.    What did you do for GE?
11         A.    I worked in test construction for
12    engineers.
13         Q.    Test?
14         A.    For the engineering department, it's
15    sort of hard to explain.
16         Q.    I just didn't hear you right.  You said
17    T-E-S-T construction?
18         A.    Yes, prototype things.
19         Q.    These are written quality control type
20    tests?
21         A.    Yes.
22         Q.    Prior to working at GE, did you work
23    somewhere else?
24         A.    Mmhmmm, yes.
25         Q.    Where did you work?
```

1                         HARMON

2          A.    I worked for a company called

3    International Computers.  It was an English firm.

4          Q.    How long did you work there?

5          A.    I believe nine years.

6          Q.    What was your job there?

7          A.    Electronical assembler.

8          Q.    You worked on an assembly line?

9          A.    Well, it wasn't really an assembly

10   line.  It was electronic boards.  You either built

11   them or you reworked them.  It wasn't an assembly

12   line type thing.

13         Q.    I understand.  When you started working

14   at Met Life, what was your job title?

15         A.    Case manager specialist.

16         Q.    How long did you hold that title?

17         A.    Five or six years.

18         Q.    When you started working at Met Life,

19   did they have some type of training program?

20         A.    Yes.

21         Q.    What did it consist of?

22         A.    How to handle claims.

23         Q.    Did you go to an actual classroom?

24         A.    Yes.

25         Q.    How long of a time frame was that?

8

```
 1                    HARMON
 2        A.     Approximately six weeks.
 3        Q.     Where was that?
 4        A.     Onsite.
 5        Q.     Where is onsite?
 6        A.     Oh, well, at that time we were in
 7   another building.  It was in Schuyler, New York.
 8        Q.     Schuyler?
 9        A.     Yes.
10        Q.     Is that near Utica?
11        A.     Yes.
12        Q.     Did they give you some type of an exam
13   at the end?
14        A.     Several.
15        Q.     Did that testing qualify you to do a
16   particular task like did you get some kind of
17   certification?
18        A.     I don't know if you call it a
19   certification.  If you pass, you got the job.
20        Q.     What kind of materials did they give
21   you at the training?
22        A.     There was so many.  It all depended
23   what the criteria was for that day.  It could have
24   been medical terminology.  It could have been
25   systems, you know, different types of software and
```

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

9

```
 1                      HARMON
 2    how to handle claims.
 3         Q.    Did they give you a manual that you had
 4    like some sort of a manual textbook for the class?
 5         A.    Yes.
 6         Q.    Do you still have that?
 7         A.    Not physically, it's on-line.
 8         Q.    It's on-line?
 9         A.    Yes.
10         Q.    What is it called?
11         A.    Case Management Guidelines.
12         Q.    When you say "it's on-line", do you
13    have access to it at your terminal?
14         A.    Yes.
15         Q.    How would you access it?  Is it on a
16    mainframe or do you have like a copy on your
17    individual computer?
18         A.    No, it's shared.  Everybody uses it.
19         Q.    Is there an index?
20         A.    Yes.
21         Q.    How would you look something up in the
22    guidelines?
23         A.    Under the subject.
24         Q.    Okay, and when you say "subject", what
25    do you mean?
```

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

10

1                      HARMON

2        A.      There's one for Social Security,

3    there's one for appeals and there's one for case

4    management, but there's different subtitles, but I

5    don't remember.

6        Q.      Does it have a search function where

7    you put in "Social Security" and it will give you

8    all the documents and derivatives of Social

9    Security?

10       A.      Yes, if I'm understanding the question

11   right.

12               MR. MARCUS:  Make sure that you

13   understand the question.

14       Q.      What I'm saying is can you basically

15   Google the information on it by putting in "Social

16   Security" and then it would search for references

17   within the manual of Social Security?  I'm just

18   using "Social Security" as an example.

19       A.      I believe that would bring you

20   something.

21       Q.      How long during the normal course of

22   business do you refer back to the Case Management

23   Guidelines?

24       A.      Not very often.

25       Q.      Just take the last six months.  How

11

```
 1                         HARMON
 2    many times in the last six months have you looked?
 3         A.    I don't remember.
 4         Q.    More than ten?
 5         A.    No.
 6         Q.    More than five?
 7         A.    I'm guessing.  It would be guessing but
 8    no.
 9         Q.    Besides the Case Management Guidelines,
10    was there any other information or documentation
11    given to you during the training period?
12         A.    Yes, there was.
13         Q.    What kind of other documents were given
14    to you?
15         A.    Like I said, it was basically for the
16    subject that we were discussing that day.  A lot of
17    it was written on the board.  From what I remember,
18    it was samples.  That's almost ten years ago, so
19    it's, you know.
20         Q.    Who were the instructors?  Were they
21    Met Life employees?
22         A.    Yes.
23         Q.    Did they have any outside consultants
24    also teach?
25         A.    Not that I recall.
```

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

12

```
 1                        HARMON
 2        Q.      You said before that you held the
 3   position of case manager for about five or six
 4   years?
 5        A.      Mmhmmm, yes.
 6        Q.      What position did you hold after that?
 7        A.      Appeals specialist.
 8        Q.      When you became an appeals specialist,
 9   did you have to undergo additional training?
10        A.      Yes.
11        Q.      Where was that done?
12        A.      Onsite.
13        Q.      How long was that training program?
14        A.      Approximately three months, not
15   consecutively.
16        Q.      So you spent --
17        A.      If that's the question.
18                MR. MARCUS:  Wait for the question to
19   be asked, please.
20        Q.      So it wasn't three consecutive months
21   in the classroom?  You would go periodically during
22   that three-month period for training?
23        A.      No, it was -- what's the word I'm
24   looking for -- peer review.
25        Q.      What do you mean by "peer review"?
```

13

1                        HARMON

2        A.      I was doing the job and somebody

3    followed it to make sure that I was following the

4    procedure.

5        Q.      So it was an apprenticeship program or

6    mentor program?  You had a mentor that would help

7    you during your appeals?

8        A.      Yeah.

9        Q.      That lasted, you said, three months?

10       A.      Approximately.

11       Q.      In addition to that, was there also

12   classroom time?

13       A.      There was always classroom time.

14       Q.      When you say, "There was always," do

15   you continuously get trained?

16       A.      Yes.

17       Q.      How often do you get trained?

18       A.      It varies.

19       Q.      Would you say once a year?

20       A.      No, more than that, anywhere between

21   two to four months.

22       Q.      Okay, and when was the last time you

23   were trained?

24       A.      Approximately three weeks ago I had

25   training, I had a training class, yes.

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

14

```
 1                      HARMON
 2        Q.    How long did that last?
 3        A.    Four hours.
 4        Q.    What was the topic of that class?
 5        A.    Claim procedure.
 6        Q.    Are you still an appeals specialist?
 7        A.    Yes.
 8        Q.    Would you describe what your duties are
 9   as an appeals specialist.
10        A.    When an appeal comes in, I review the
11   claim, I have it reviewed by a physician, and then
12   when I get that report back, I have to make the
13   determination of whether the reasoning that that
14   person was denied or terminated was correct.
15        Q.    How is it that a particular appeal
16   comes to you?
17        A.    They're assigned.
18        Q.    Right, but is that on a random basis?
19        A.    Yes.
20        Q.    How many appeal specialists are in the
21   Utica office?
22        A.    I believe fifteen.
23        Q.    Fifteen?
24        A.    I'm not sure about that.
25        Q.    Who do you report to?
```

24

```
 1                    HARMON
 2        Q.      Is that something that you refer to
 3   often?
 4        A.      No.
 5        Q.      Are there any other manuals that you
 6   have at your desk besides Merck?
 7        A.      No.
 8        Q.      Besides the Claims Management
 9   Guidelines and Merck Manual, are there any other
10   guidelines that you refer to for purposes of your
11   job?
12        A.      No.
13        Q.      Does Met Life have a library at your
14   facility?
15        A.      No.
16        Q.      Are you familiar with the Dictionary of
17   Occupational Titles?
18        A.      Yes.
19        Q.      Is that a book that you have at your
20   desk?
21        A.      No.
22        Q.      Do you have that on-line?
23        A.      I don't know.
24        Q.      Do you know what the DOT means by
25   "sedentary"?
```

1                          HARMON

2    ongoing basis?

3          A.    Yes.

4          Q.    Do you personally have the authority to

5    request a document review by a physician?

6          A.    Yes.

7          Q.    An outside physician?

8          A.    Yes.

9          Q.    Do you personally have the authority to

10   request an examination by an outside physician?

11         A.    Yes.

12         Q.    When I say "authority", you don't have

13   to get somebody else's approval before that's done?

14         A.    No.

15         Q.    Do you have the authority to request

16   that a reviewing physician contact the treating

17   physician?

18         A.    Yes.

19         Q.    Is that something that you ask them to

20   do on a normal basis?

21         A.    No.

22         Q.    Why not?

23         A.    Because the claimant is responsible for

24   submitting medical information for review, that

25   should be all we need.

```
 1                        HARMON
 2        Q.    So you don't think that talking to the
 3   treating physician would be helpful?
 4        A.    No.
 5        Q.    Are you familiar with NMR?
 6        A.    Yes.
 7        Q.    Is NMR always the outside vendor for
 8   reviewing physicians?
 9        A.    No.
10        Q.    What other vendors do you use?
11        A.    There's another one called NCM.
12        Q.    What is that?
13        A.    Network Consultants, but I'm not sure.
14        Q.    Is that out of Georgia?
15        A.    Possibly.
16        Q.    Besides NMR and NCM, are there any
17   others?
18        A.    Reed.
19        Q.    Reed?
20        A.    Mmhmmm, R-E-E-D.
21        Q.    Any others?
22        A.    Unival, U-N-I-V-A-L.
23        Q.    Any others?
24        A.    I'm not sure.
25        Q.    How would you decide which vendor to
```

1                          HARMON

2    consult?

3          A.     I don't.

4          Q.     What do you mean you don't?

5          A.     I just request a specialty.

6          Q.     Who are you requesting that to?

7          A.     Clerical department.

8          Q.     Okay, so let's go through the process

9    of how you get a reviewer.  What would be the first

10   step that you would do to start the process?

11         A.     When I get an appeal?

12         Q.     Right, after you have an appeal and

13   you've already decided that you want a document

14   review, let's say, what procedure do you follow to

15   obtain the document review?

16         A.     I have everything in the file copied, I

17   fill out the form, I put what specialties are

18   needed and I send it to the clerical department.

19         Q.     Then at that point somebody in the

20   clerical department decides who to contact?

21         A.     I don't know.  I don't know how she

22   does it.

23         Q.     At some point you'll just get back a

24   review?

25         A.     I'll get a note telling me where it's

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

1              HARMON

2    guideline based on the diagnosis of when the

3    minimum and the maximum amount of time the person

4    should be paid through.

5         Q.    Am I reading this correctly that if

6    somebody has MS and has sedentary work, the normal

7    pay period would be ninety-one days?

8         A.    This is a guideline.

9         Q.    Yes, but that would be what the

10   guideline is saying?

11        A.    They'd have to factor in the diagnosis

12   and everything, you know, what the exacerbation was

13   and things like that.

14        Q.    Is this from the Met Life Disability

15   Duration Guidelines?

16        A.    Yes.

17        Q.    Do these guidelines enter into your

18   determination as an appeals specialist?

19        A.    Sometimes.

20        Q.    Can you give me some instances when

21   they would?

22        A.    More for fractures, things that would

23   heal, like that.

24        Q.    So if you are reviewing a denial and,

25   let's say, it's a bone fracture and the guidelines,

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

EXHIBIT D

# LESTER SCHWAB KATZ & DWYER, LLP
120 BROADWAY
NEW YORK, N.Y. 10271-0071

(212) 964-6611
FAX: (212) 267-5916

ALLAN M. MARCUS
Writer's Direct Dial: (212) 341-4241
E-Mail: amarcus@lskdnylaw.com

NEW JERSEY OFFICE
24 LACKAWANNA PLAZA
MILLBURN, N.J. 07041
(973) 912-9501

October 26, 2004

**Via Hand Delivery**

Scott M. Riemer, Esq.
60 East 42nd Street, 47th Floor
New York, NY 10165

     Re:   **Mark Winkler v. Metropolitan Life Insurance Company**
             **03 CV 9656 (SAS)(AJP)**

Dear Scott:

In accordance with the Court's Order of July 30, 2004, defendant Metropolitan Life Insurance Company ("MetLife") hereby produces the following documents:

1.    MetLife's group policy no. 91630-G. (Exhibit A)

2.    Computer screen prints related to plaintiff's claim. (Exhibit B)

3.    Curriculum vitae for MetLife's independent physician consultants ("IPCs"), Dr. Greenhood, Dr. Kilburn and Dr. Shallcross. (Exhibit C)

4.    Sections of MetLife's claims manual that refer to HIV and depression. (Exhibit D)  Since these are confidential, proprietary materials, I have enclosed a Confidentiality Stipulation and Order for you to execute and return to me.

5.    MetLife's communications with the IPCs relating to plaintiff's claim are found in the claim file already produced to plaintiff. MetLife has not found any other such communications.

6.    MetLife inquired of the IPCs as to whether they maintained any separate files with respect to plaintiff's claim. They each responded that they do not maintain any separate files.

In addition, MetLife provides the following information pursuant to the Court's Order:

1.    <u>Affiliations of IPCs</u>:  None of the IPCs are MetLife employees. As reflected in their CVs, Dr. Greenhood is an urgent care physician affiliated with Kaiser Permanente in Atlanta, Georgia, as well as doing consulting work. Dr. Kilburn is employed as Medical Director for Prest & Associates in Madison, Wisconsin and

LESTER SCHWAB KATZ & DWYER, LLP

Scott M. Riemer, Esq.
October 26, 2004
Page 2

Atlanta, Georgia, and also does independent consulting work. Dr. Shallcross is in private practice in Atlanta, Georgia, where he is associated with several area hospitals. He also does consulting work for various insurance companies and for the Social Security Administration.

2.    Consulting for MetLife as Percentage of IPC's Workload:    MetLife inquired of the IPCs as to approximately what percentage of their current workload is consulting for MetLife. Their responses were: Dr. Greenhood: 80%; Dr. Kilburn: 33%; Dr. Shallcross: 40%.

3.    Frequency of MetLife's Consultation with IPC's:    MetLife found that it consulted Dr. Greenhood 1,536 times on disability claims in 2003; Dr. Kilburn 414 times on disability claims in 2003; Dr. Shallcross 287 times on disability claims in 2003.

4.    MetLife's Decision-Maker:    The MetLife employees who made the final decision to deny plaintiff's benefit claim were Ferne Conroy and Ann Gunby.

Very truly yours,

ALLAN M. MARCUS
Of Counsel

AMM:dg/645373
Enclosure

EXHIBIT E

09710701

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

THOMAS B. WRIGHT,                    )
                                     )    Civil Action No. 3:04-0327
                 Plaintiff,          )    Judge Haynes
                                     )
v.                                   )
                                     )
METROPOLITAN LIFE INSURANCE          )
COMPANY,                             )
                                     )
                 Defendant.          )

## DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Metropolitan Life Insurance Company ("MetLife"), through its through its attorneys, Holland & Hart LLP, hereby submits the following Objections, Responses to Plaintiff's First Set of Interrogatories to Defendant, pursuant to the Federal Rules of Civil Procedure.

### PRELIMINARY STATEMENTS AND GENERAL OBJECTIONS

This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Accordingly, the Court's review of this action should be limited to the materials presented to the claims administrator at the time the decision concerning benefits was made. *See Sandoval v. Aetna Life & Cas. Co.*, 967 F.2d 377, 380-81 (10th Cir. 1992); *Woolsey v. Marion Labs., Inc.*, 934 F.2d 1452, 1460 (10th Cir. 1991); *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991); *Perry v. Simplicity Eng'g*, 900 F.2d 963, 967 (6th Cir. 1990); *Guthrie v. Hewlett-Packard Co. Employee Benefits Org.*, 773 F. Supp. 1414 (D. Colo. 1991). Under the ERISA-mandated scope of review, discovery is limited to determining whether the administrative record (*i.e.*, the claim file) is complete, and

any information not in the administrative record is irrelevant. *See, e.g., Macklin v. Retirement Plan for Employees of Kansas Gas & Elec. Co.*, 99 F.3d 1150 (Table), 1996 WL 579940 (10th Cir. 1996); *Caldwell v. Life Ins. Co. of North Am.*, 165 F.R.D. 633, 637 (D. Kan. 1996); *Hemphill v. Unisys Corp.*, 855 F. Supp. 1225, 1239 (D. Utah 1994); *Edens v. Central Benefits Nat'l Life Ins. Co.*, 900 F. Supp. 928, 931 (W.D. Tenn. 1995). Accordingly, MetLife objects to any request for information herein, or any other discovery, which seeks information other than the identification of the administrative record or verification of its completeness. Any other request for information seeks information not relevant to the issues in this case and is not reasonably calculated to lead to the discovery of admissible evidence

To the extent that any Interrogatory can be interpreted as requiring MetLife to identify documents or information that may be in the possession, custody or control of Plaintiffs or others and have not yet been made available to or are otherwise not in possession of MetLife or are equally accessible to Plaintiffs, MetLife objects thereto.

A partial response by MetLife to any Interrogatory as set forth below is not deemed to be a waiver by MetLife of its objection thereto (if any) or to the right of MetLife to object to additional, supplemental, or further requests for production, or parts thereof.

These responses are to the best of MetLife's present ability and information. MetLife reserves the right to supplement these responses after completion of discovery and further reserves the right to introduce evidence at the time of trial based upon information and/or documents located, developed, or discovered subsequent to the date hereof, which evidence may supplement, amplify, modify or be in conflict with the following answers which are based upon present information only.

2

Interrogatory No. 1:

For all of the physicians who evaluated Plaintiff's claim for benefits, or examined his medical records, or otherwise provided an opinion at the request of MetLife in this case, please state whether said physician was an employee of MetLife, or a related company, or, if the physician was not an employee of MetLife, please state how many records wee reviewed by said physician on behalf of MetLife.

Response to Interrogatory No.1:

MetLife objects to this Interrogatory to the extent that it varies from the Interrogatory the Court instructed Plaintiff to submit to MetLife. Specifically, with respect to physicians who evaluated Plaintiff's claim for benefits, but are not employees of MetLife, the Court ordered Plaintiff to submit an Interrogatory inquiring (a) how long such physician has acted as an independent contractor to MetLife, and (b) how many patients MetLife has referred to such physician. Subject to this objection, MetLife responds as follows:

Amy Hopkins, M.D., Board Certified in Internal Medicine and Occupational Medicine, is not an employee of MetLife. Dr. Hopkins is an independent physician consultant retained by MetLife to review Mr. Wright's medical records and provide her opinion regarding Mr. Wright's functional ability. Dr. Hopkins has provided consulting services to MetLife in the form of medical records reviews since September 1999. MetLife is presently reviewing its records to provide a supplemental response regarding the number of files reviewed by Dr. Hopkins on behalf of MetLife.

Michael J. Rosenberg, M.D., Board Certified in Internal Medicine, Cardiology, and Interventional Cardiology, is not an employee of MetLife. Dr. Rosenberg is an independent physician consultant who reviewed Mr. Wright's medical records and provided his opinion

3

regarding Mr. Wright's functional ability. MetLife retained Elite Physicians, Ltd., a physician referral service, to have a Board Certified cardiologist conduct a medical records review of Mr. Wright's file. Elite Physicians, Ltd. referred Mr. Wright's file to Dr. Rosenberg. MetLife does not maintain records regarding the number of files Dr. Rosenberg may have reviewed for MetLife because the referral was made, and any services paid for, through Elite Physicians, Ltd.



Gary P. Greenhood, M.D., Board Certified in Internal Medicine and Infectious Disease, is not an employee of MetLife. Dr. Greenhood is an independent physician consultant who reviewed Mr. Wright's medical records and provided his opinion regarding Mr. Wright's functional ability. MetLife retained Elite Physicians, Ltd., a physician referral service, to have a physician Board Certified in internal medicine and infectious disease conduct a medical records review of Mr. Wright's file. Elite Physicians, Ltd. referred Mr. Wright's file to Dr. Greenhood. MetLife does not maintain records regarding the number of files Dr. Greenhood may have reviewed for MetLife through Elite Physicians because the referral was made, and any services paid for, through Elite Physicians, Ltd. Dr. Greenhood also has been retained directly by MetLife to provide consulting services to MetLife in the form of medical records reviews with respect to other claimants (although not with respect to Mr. Wright).

Robert G. Slack, M.D., Board Certified in Psychiatry and Neurology, is not an employee of MetLife. Dr. Slack is an independent physician consultant who reviewed Mr. Wright's medical records and provided his opinion regarding Mr. Wright's functional ability and related matters. MetLife retained Elite Physicians, Ltd., a physician referral service, to have a Board Certified psychiatrist conduct a medical records review of Mr. Wright's file. Elite Physicians, Ltd. referred Mr. Wright's file to Dr. Slack. MetLife does not maintain records regarding the

4

number of files Dr. Slack may have reviewed for MetLife because the referral was made, and
any services paid for, through Elite Physicians, Ltd.

## Supplemental Response to Interrogatory No. 1:

MetLife incorporates its objections and responses set forth in its Response to
Interrogatory No. 1. MetLife further states that Amy Hopkins, M.D., has reviewed an average of
four to five hundred files a year on behalf of MetLife since September 1999.

## OATH

STATE OF NEW YORK

COUNTY OF QUEENS

Personally appeared before me, the undersigned, a Notary Public in and for said state and
county, Laura Sullivan, who acknowledged that (s)he is a Business Consultant of Metropolitan
Life Insurance Company, and that the answers contained in the foregoing interrogatories are true
and correct to the best of her information, knowledge and belief.

Metropolitan Life Insurance Company

By: _____

Sworn to and subscribed before me this
10th day of _September_ 2004.

_____
NOTARY PUBLIC
My Commission Expires:_____

LAWRENCE WOLF
Notary Public, State of New York
No. 4821822
Qualified in Queens County
My Commission Expires February 07, 2006

5

EXHIBIT F

## NMR CASE LIST FOUND ON WESTLAW

### Cases Involving Network Medical Review

(1)    *Adamson v. Metropolitan Life Ins. Co.*, 2001 WL 111227 (D.Md. 2001)

(2)    *Aloisi v. Lockheed Martin, Inc.*, 321 F.3d 551 (6ᵗʰ Cir. 2003)

(3)    *Austin v. Continental Cas. Co.*, 216 F.Sup2d 550 (W.D.N.C. 2002)

(4)    *Baker v. Abo*, 2003 WL 21639151 (D.Minn. 2003)

(5)    *Bishop v. Metropolitan Life Ins. Co.*, 2003 WL 21659439 (6ᵗʰ Cir. 2003)

(6)    *Bismark-Thurbush v. Metropolitan Life/Disability Ins. Co.*, 2004 WL 1093611 (N.D.Ill. 2004)

(7)    *Bolan v. Barnhart*, 212 F.Supp.2s 1248 (D.Kan. 2002)

(8)    *Brooks v. North American Philips Corp.*, 142 F.Supp.2d 407 (W.D.N.Y. 2001)

(9)    *Caraveo v. U.S. E.E.O.C.*, 2004 WL 608590 (2nd Cir. 2004)

(10)   *Chandler v. Raytheon Employees Disability Trust*, 53 F.Supp.2d 84 (D.Mass. 1999)

(11)   *Coday v. Metropolitan Life Ins. Co.*, 193 F.Supp.2d 1332 (D.Kan. 2002)

(12)   *Coffman v. Metropolitan Life Ins. Co.*, 218 F. Supp.2d 715 (S.D.W.Va. 2002)

(13)   *Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793 (8th Cir. 2002)

(14)   *Cook v. New York Times Co., Long-Term Disability Plan*, 2004 WL 203111 (S.D.N.Y. 2004)

(15)   *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516 (6th Cir. 2003)

(16)   *Dew v. Metropolitan Life Ins. Co.*, 69 F.Supp.2d 898 (S.D.Tex. 1999)

(17)   *De Dios Cortse v. MetLife, Inc.*, 122 F.Supp.2d 121 (D.Puerto Rico 2000)

(18)   *Downey v. Aetna Life Ins. Co./U.S. Healthcare*, 2003 WL 21135710 (D.Mass. 2003)

(19)   *Dreiman v. PSI Energy, Inc.*, 2002 WL 31427445 (S.D.Ind. 2002)

(20)    *Dubuc v. Whitney Nat. Bank Plan*, 199 WL 4919 (E.D.La. 1999)

(21)    *Durr v. Metropolitan Life Ins. Co.*, 15 F.Supp.2d 205 (D.Conn. 1998)

(22)    *Dusablon v. Raytheon Corp.*, 1997 WL 683846 (D.Mass. 1997)

(23)    *Dwyer v. Metroplitan Life Ins. Co.*, 2001 WL 94749 (4th Cir. 2001)

(24)    *Eriksen v. Metropolitan Life Ins. Co.*, 39 F.Supp.3d 864 (E.D.Mich. 1999)

(25)    *Etkin v. Merk & Co., Inc.*, 2001 WL 1346368 (E.D. Pa. 2001)

(26)    *Hagberg v. Liberty Life Assur. Co. of Boston*, 321 F.Supp.2d (N.D. Fla. 2004)

(27)    *Hill v. Metropolitan Life Ins. Co.*, 218 F.Supp.2d 128 (D. Puerto Rico 2002)

(28)    *In re Campbell*, 116 F.Supp.2d 937 (M.D.Tenn. 2000)

(29)    *Irvin v. Metropolitan Life Ins. Co.*, 1998 WL 401690 (E.D.Pa. 1998)

(30)    *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir. 1998)

(31)    *Leahy v. Raytheon Co.*, 315 F.3d 11 (1sr Cir. 2002)

(32)    *Mormile v. Metropolitan Life Ins. Co.*, 91 F.Supp.2d 492 (D.Conn. 2001)

(33)    *Mueller v. CAN Group Life Assurance Co.*, 2004 WL 1161173 (N.D.Cal. 2004)

(34)    *Nichols v. Verizon Communications, Inc.*, 2003 WL 22384772 (3rd Cir. 2003)

(35)    *Payton v. C.I.R.*, 2001 WL 1922058 (U.S. Tax Ct. 2001)

(36)    *Piscottano v. Metropolitan Life Ins. Co.*, 118 F.Supp.2d 200 (D.Conn. 2000)

(37)    *Pollini v. Raytheon Disability Employee Trust*, 54 F.Supp.2d 54 (D.Mass. 1999)

(38)    *Pratlutsky v. Metropolitan Life Ins. Co.*, 316 F.Supp.2d 840 (D.Minn. 2004)

(39)    *Rendulic v. Kaiser Aluminum & Chemical Corp.*, 166 F.Supp.2d 326 (W.D.Pa. 2001)

(40)    *Scardo v. Metropolitan Life Ins. Co.*, 2000 WL 33281679 (W.D. Va. 2000)

(41)    *Sheehan v. Metropolitan Life Ins. Co.*, 2003 WL 22290230 (S.D.N.Y. 2003)

(42)    *Smith v. Continental Cas. Co.*, 276 F.Supp.2d 447 (D.Md. 2003)

(43)    *Stvartak v. Eastman Kodak Co.*, 945 F.Supp. 1532 (M.D.Fla. 1996)

(44)    *Sullivan v. Raytheon Co.*, 262 F.3d 41 (1st Cir. 2001)

(45)    *Tholke v. Unisys Corp.*, 2003 WL 21203349 (S.D.N.Y. 2003)

(46)    *Tremain v. Bell Indus. Inc.*, 196 F.3d 970 (9th Cir. 1999)

(47)    *Vartanian v. Metropolitan Life Ins. Co.*, 2002 WL 484852 (N.D.Ill. 2002)

(48)    *Vaugh v. Metropolitan Life Ins. Co.*, 87 F.Supp.2d 421 (E.D.Pa. 2000)

(49)    *Voight v. Metropolitan Life Ins. Co.*, 28 F.Supp.2d 569 (C.D.Cal. 1998)

(50)    *Welch v. CoreStates Financial Corp.*, 1999 WL 387276 (E.D.Pa. 1999)

(51)    *Willis v. ITT Educational Services, Inc.*, 254 F.Supp.2d 926 (S.D.Ohio 2003)
L:\Denm001\NMR.Caselist1.wpd