UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DEBORAH M. BOURQUE,

    Plaintiff

v.                                                          Civil Action No. 04-12037-WGY

METROPOLITAN LIFE INSURANCE
COMPANY ET AL

    Defendants

## EXHIBIT A TO MOTION OF PLAINTIFF TO COMPLETE RECORD ON REVIEW

### Part I of II

DEBORAH BOURQUE
By Her Attorneys,

*/s/Jonathan M. Feigenbaum*
_____
Jonathan M. Feigenbaum, Esq.
B.B.O. N#546686
Philips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. : (617) 367-8787

L:\Dbor002\exhibit A.wpd

Westlaw.

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Joseph PALMIOTTI, Plaintiff,
v.
METROPOLITAN LIFE INSURANCE COMPANY,
Defendant.
**No. 04 Civ. 0718(LTS)(J.**

March 9, 2005.

*MEMORANDUM AND ORDER*

FRANCIS, Magistrate J.

*1 Joseph Palmiotti brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.,* challenging the decision of the Metropolitan Life Insurance Company ("MetLife") denying his claim for long term disability benefits. MetLife now moves under Rule 26(c) of the Federal Rules of Civil Procedure for a protective order requiring that its Claims Management Guidelines (referred to hereafter as the "Claims Manual") be kept confidential. It previously disclosed the Claims Manual to counsel for the plaintiff on an attorneys'-eyes-only basis pending an agreement by counsel regarding confidentiality or an order by the Court resolving the issue. Having failed to reach agreement, the parties have now submitted the dispute to me.

In the course of discovery, a court may issue an "order which justice requires to protect a party from the annoyance, embarrassment, oppression, or undue burden or expense, including ... that a trade secret or other confidential research, development or commercial information not be revealed or be revealed only in a designated way." Fed.R.Civ.P. 26(c). "The party

seeking protection has the burden of coming forward with evidence demonstrating that the information is confidential and that disclosure will result in a clearly defined and serious injury to its business." *Cohen v. Metropolitan Life Insurance Co.,* No. 00 Civ. 6112, 2003 WL 1563349, at *1 (S.D.N.Y. March 26, 2003) (citing *Bank of New York v. Meridian BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 143-44 (S.D.N.Y.1997)).

The Claims Manual at issue here is the type of internal corporate document that may constitute confidential business information. *See Bank of New York,* 171 F.R.D. at 144. However, whether it ultimately merits protection depends on a variety of considerations, including "(1) the extent to which such information is known outside the business; (2) the extent to which information is known to those inside the business; (3) the measures taken to guard the secrecy of the information; and (4) the value of the information to the business and its competitors." *Id.* (quotation marks and citations omitted). The evidence proffered by MetLife addresses primarily the third and fourth factors.

A MetLife representative has attested that the company maintains the Claims Manual in a secure electronic database. (Affidavit of Cindy Broadwater dated Jan. 5, 2005 ("Broadwater Aff."), ¶ 3). It is marked confidential, and employees are instructed not to disseminate it. (Broadwater Aff., ¶¶ 4, 5). Thus, MetLife has established that it has made efforts to keep the Claims Manual secret.

MetLife also contends that it has devoted substantial resources to development of the Claims Manual, and that it would be damaged if competitors were able to duplicate its claims processing procedures without investing similar time and effort. (Broadwater Aff., ¶6). This argument is less convincing because it is largely conclusory. "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the 26(c) test." *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** In any event, no protective order is warranted because federal regulations require the broad disclosure of the information that MetLife seeks to keep confidential. In order to satisfy the statutory requirements to provide a fair claims procedure, an employee benefit program must provide to a claimant upon request "all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii). The regulations go on to define as relevant any document that "[d]emonstrates compliance with the administrative process and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination." 29 C.F.R. § 2560.503-1(m)(8)(iii). And paragraph (b)(5) requires that "[t]he claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5). In short, the adequacy of claims processing procedures is relevant to whether the denial of a claim is arbitrary and capricious, and, because the procedures are relevant, claimants are entitled to have access to them. Under these circumstances, the Claims Manual is required to be made widely available outside MetLife; the company's efforts to maintain secrecy are necessarily futile; and the claim of competitive harm is negated because each of MetLife's competitors is subject to the same regulations.

The cases cited by MetLife do not dictate a contrary result. *Doe v. Travelers Insurance Co.,* 167 F.3d 53, 60 (1st Cir.1999), and *Diagnostic Medical Associates v. Guardian Life Insurance Co.,* 157 F.Supp.2d 292, 301 (S.D.N.Y.2001), d eal n ot w ith t he c onfidentiality of claims procedures but with the consequences of failing to disclose them to claimants. *Robbins v. Milliman USA Long Term Disability Insurance Plan,* No. 1:02-CV-01635, 2003 WL 22246952, at \*2, 9 (S.D. Ind. June 25, 2003), did concern a request for internal guidelines and claims processing manuals. However, the court's refusal to order their disclosure was based on the perception that the claimant's counsel had abandoned his request for them. *Id.* at \*9. Finally, in *Cohen,* 2003 WL 1563349, at \*1, 3, the court did

require that any production of MetLife's Claims Manual be made pursuant to a confidentiality order. However, that determination was based on a finding that the Claims Manual was not a plan document required to be disclosed to claimants pursuant to 29 U.S.C. § 1024(b)(4). *Id.* at \*1-2. The regulations discussed above, which do require disclosure of documents such as the Claims Manual, were apparently not considered because they were not brought to the attention of the court.

*Conclusion*

Pursuant to federal regulation, claimants are entitled to receive documents describing claims processing procedures such as the Claims Manual at issue here. Consequently, MetLife cannot maintain confidentiality for such documents, and its motion for a protective order is therefore denied.

**\*3** SO ORDERED.

2005 WL 552017 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

. 1:04CV00718 (Docket)

(Jan. 30, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**Created By:** Linda Boncek/Ins/MetLife/US    **Date Created:** 06/29/2000

Please refer to the Archive View for prior versions of this document.

# Claim Management Guidelines
## 6. Claim Workflow
### Chapter 5: LTD ACT Criteria
#### Effective Date: 07/01/2000

## Introduction

The aproach to LTD claimadjudication is similar to that for STD claims. This chapter describes ACT and TLC claim criteria, associated clinical caveats, as well as recommended claim management strategies.

## ACT LTD Claim Criteria

The ACT LTD claim criteria and related workflow offers the following advantages:

- Expediting the LTD claim payment process for employees with severe or debilitating illnesses or injuries, and
- Streamlining the MetLife Disability LTD claim workflow.

A claim may be included in the LTD ACT workflow if:

- The presence of one of the designated medical conditions is identified, and
- It is verified that the claim also meets the clinical caveats listed for the condition.

NOTE: *Inclusion of a claim in the LTD ACT category facilitates prompt claim adjudication and payment of benefits. It does not imply claim approval indefinitely.*

The CS/CM should utilize the appropriate claim resource, including the Nurse Consultant, *only when necessary*, to:

- Clarify the diagnoses,
- Assure that the medical condition meets the ACT LTD criteria, or
- Determine the opportunity for co-management to positively impact the claim's outcome.

The ACT LTD Table provides the following information:

- Name of the ACT LTD Clinical Condition,
- Clinical Caveats,
- Re-assessment timeframes to be used as a guideline for clinical re-evaluation, and

000003 MetLife Claims Guidelines Palmiotti v MetLife

- Recommendations when Nurse Consultant Co-management may be indicated.

> Note: The LTD ACT criteria does not include any mandatory referrals to specialty resources. However, it does offer the CS/CS some guidance in determining which resource is most appropriate should the CS/CM decide to seek input from the specialty resources.

> Note: All approved LTD claims will continue to have a review conducted by the Social Security Specialist to determine if application for Social Social disability benefits is appropriate. Since the diagnoses included in the LTD ACT criteria indicate the likely presence of a significant functional impairment, it is possible that many of these claims will be approved for Social Security disability benefits at the initial level, thus increasing the importance of filing an application as soon as possible.

## ACT LTD Table

| Clinical Condition | ICD 9 Code | Clinical Caveat | Medical Re-Assessment | Co-management Recommendations |
|---|---|---|---|---|
| Acquired Immune Deficiency Syndrome | 042<br>042.9 | Look for the diagnosis of AIDS with evidence of at least two (2) of the following:<br>• Opportunistic infections within the last 6 months<br>• Encephalitis / Dementia / Cognitive changes<br>• "Wasting" syndrome<br>• Recent hospitalization.<br><br>T-cell or Viral Load should not be used as the sole indicator. | Three (3) Months | Co-management by the Nurse Consultant is highly recommended. |
| Acute Leukemia | 204.0<br>205<br>205.0 | • Currently receiving chemotherapy<br>• Employee is on a bone marrow transplant list<br>• Employee was a recent bone marrow transplant recipient (i.e., within 6 - 12 months). | Six (6) Months | |
| Amyotrophic Lateral Sclerosis (ALS) | 335.20 | • Under the care of a Neurologist<br>• Severity is documented<br>• Documented significant motor and coordination deficits<br>• Muscular weakness, | Six (6) Months | |

ML0401

**000004 MetLife Claims Guidelines Palmiotti v MetLife**

| | | | | |
|---|---|---|---|---|
| | | atrophy, spasticity.<br>• Dysarthria, or<br>  dysphagia is<br>  documented | | |
| Amputation – one or more extremity | 897.0 | Amputation that has occurred during the past six (6) months due to:<br>• Diabetes<br>• Peripheral vascular disease<br>• Trauma | Three (3) Months, or upon discharge from acute rehabilitation facility | Co-management by the Nurse Consultant is recommended.<br><br>Referral to the VRC should be a strong consideration. |
| Aortic Aneurysm | 441.4<br>442.9 | Clinically documented by diagnostic imaging and surgical repair:<br>• Performed within the past three (3) months, or<br>• Anticipated within the next three (3) months | Six (6) Months | Co-management by the Nurse Consultant should be considered. |
| Blindness / Loss of vision in both eyes | 369.4 | • Recent onset by trauma or gradual onset with recent worsening documented by clinical information<br>• Corrected vision is worse than 20/200 in the better eye<br>• Documented legal blindness | Six (6) Months | Co-management by the Nurse Consultant is recommended.<br><br>Referral to the VRC should be a consideration. |
| Cancer of the pancreas, pleura, liver, kidney or lung | 150.9<br>151.9<br>155.2<br>157.9<br>162<br>162.2<br>162.3<br>162.5<br>162.8<br>162.9<br>189.0 | • Clinical evidence of metastases<br>• Receiving chemotherapy and/or radiation therapy<br>• Surgical intervention in the past three (3) months or anticipated in the next three (3) months<br>• Current treatment focus is on palliative care | Six (6) Months | Co-management by the Nurse Consultant should be considered. |
| Cardiomyopathies | 425<br>425.4 | • Severe or awaiting transplant<br>• Ejection Fraction < 25%<br>• Severe symptoms affecting sedentary or light levels of daily activity | Six (6) Months | Co-management by the Nurse Consultant should be considered. |
| Chronic Liver Disease | 571<br>571.2<br>571.4<br>571.40<br>571.5 | • "End Stage" liver disease described in medical notes<br>• Employee is awaiting a liver transplant<br><br>Cirrhosis *alone is not sufficient criteria.* | Six (6) Months | |
| Chronic Obstructive | 491.2 | • Employee | | |

3

Metropolitan Life Proprietary & Confidential Information

ML 0402

| | | | | |
|---|---|---|---|---|
| Pulmonary Disease, COPD | 492<br>492.8<br>493.2<br>496 | requires intermittent or continuous oxygen<br>• Pulmonary Function Tests are less than 30% of predicted<br>• Job requirements include some exertional activities | Three (3) Months | Co-management by the Nurse Consultant is recommended. |
| Cardiovascular Accident, CVA | 436 | • CVA event has occurred within the past six (6) months and symptoms have affected sedentary or light levels of daily activity.<br>• There is significant impairment of the employee's speech, mobility, or cognitive function.<br>• More than one (1) extremity is affected. | Three (3) Months | Co-management by the Nurse Consultant is recommended. |
| Diabetes, with complications | 250<br>250.0<br>250.00<br>250.01<br>250.1<br>250.3<br>250.4<br>250.5<br>250.6<br>250.60<br>250.7<br>250.8 | Evaluate for the diagnosis of Insulin-Dependent (Type I) Diabetes with evidence of at least two (2) of the following:<br>• Documented gangrene<br>• Persistent diabetic ulcers have been documented<br>• Severe neuropathy of two (2) extremities<br>• Employee required more than one hospitalization during the past six (6) months.<br>• Employee requires renal dialysis | Three to Six (3 - 6) Months | Co-management by the Nurse Consultant is recommended. |
| End Stage Renal Disease | 585<br>586 | • Employee requires renal dialysis | Three to Six (3 - 6) Months | |
| Malignant Brain Tumor | 191<br>191.0<br>191.1<br>191.2<br>191.3<br>191.9<br>192.1<br>193 | • Grade III or Grade IV tumors<br>• Astrocytoma or Glioblastoma<br>• Metastatic disease is present<br>• Employee is receiving radiation | Six (6) Months | |
| Multiple Sclerosis | 340 | Severe symptoms | | |

4

Metropolitan Life Proprietary & Confidential Information

ML 0403

| | | affecting sedentary or light levels of daily activity with documented deficits in:<br>• Visual function<br>• Motor function<br>• Cognitive function | Three (3) Months | Co-management by the Nurse Consultant is highly recommended. |
|---|---|---|---|---|
| Non-Hodgkins Lymphoma | 202.8 | • Stage IV (has metastases)<br>• Receiving chemotherapy and/or radiation | Six (6) Months | |
| Organic Brain Syndrome | 290<br>290.0<br>290.10<br>293.83<br>294.8<br>294.9 | Including:<br>• Alzheimer's Disease<br>• Pick's Disease<br>• Huntington's Chorea<br>• Cruetzfeldt-Jakob | Six to Twelve (6 - 12) Months | |
| Paraplegia / Quadriplegia | 344.0<br>344.1 | • Newly diagnosed (i.e., within the past 6 months) | Three (3) Months | Co-management by the Nurse Consultant is highly recommended.<br><br>Referral to the VRC should be a strong consideration. |
| Parkinson's Disease | 332<br>332.0 | • Severe symptoms affecting sedentary or light levels of daily activity.<br>• Advanced disease with documented change in mental function, severe tremors / motor coordination. | Six to Twelve (6 - 12) Months | |
| Schizophrenia | 295.3<br>295.30<br>295.7<br>295.70<br>295.9 | • Documented hospitalizations within the past six (6) months<br>• Documented medical management without clinical or functional improvement | Six (6) Months | Co-management by the Nurse Consultant should be considered. |
| Scheduled Surgery | Coding will be based on specific diagnosis | Major surgery performed within past six (6) weeks or scheduled to occur within the upcoming six (6) weeks. | Four to Eight (4 - 8) Weeks | Co-management by the Nurse Consultant is highly recommended. |
| Awaiting Transplant | Coding will be based on type of transplant. | Documented pending transplant of:<br>• Heart<br>• Liver<br>• Pancreas,<br>• Lung or<br>• Kidney | Three to Six (3 - 6) Months | |
| Hospice Treatment | Coding based upon underlying condition. | Any condition currently being treated by Hospice. | Twelve (12) Months | |
| Cancer with | | • Clear clinical | | |

Metropolitan Life Proprietary & Confidential Information

ML 0404

000007 MetLife Claims Guidelines Palmiotti v MetLife

| metastasis | Coding will be based upon type of malignancy and location of metastasis. | evidence of metastasis must exist<br>• Receiving chemotherapy or radiation therapy | Six (6) Months | |
| Coma | Coding based on underlaying cause. | Currently in a coma, not past history of coma. | Six (6) Months | |
| Severe Trauma | Coding based on type of trauma sustained. | Requiring staged surgical procedures | Six (6) Months | Co-management by the Nurse Consultant is recommended. |

## TLC LTD Claim Criteria

Claims that do not meet the ACT LTD criteria and associated clinical caveats will be classified as TLC and will have an initial review by the Nurse Consultant.

*Note: It is recommended that for Stand-Alone LTD claims, the claim be routed directly to the CS/CM to initiate the investigation. Once medical information is obtained, the CS/CM should consider referral to the Nurse Consultant, other Specialty Resource, or Adjudication Team Meeting.*

Metropolitan Life Proprietary & Confidential Information

ML 0405

000008 MetLife Claims Guidelines Palmiotti v MetLife



Created By:    Dondra W Miller/Ins/MetLife/US     Date Created:     11/16/2002

# Claim Management Guidelines
## 7. Claim Investigation Process
## Chapter 2: Coverage Verification
### Effective Date: 12/01/2002

## Introduction

Coverage verification is a basic requirement for all initial claim analysis. The CMS should be familiar with the eligibility provisions of the plan in order to be alert to any situation which may affect the eligibility of an employee. Eligibility information pertinent to the claim under review is entered into UDS/Intellis. Once input, the information will interface with Plan Master for confirmation of eligibility.

This chapter discusses some of the topics associated with employee's coverage and benefit eligibility.

*Note: As provisions related to employee eligibility may differ between disability plans, the CMS should carefully review and become familiar with the plan provisions that are pertinent to the claim under review.*

## Effective Date Of Disability Plan

The employee must be covered by a plan that is in effect on the date of disability. No claim for benefits can be considered when it results from a disability beginning prior to the effective date of the plan.

The effective date of the plan will be indicated in Plan Master. Intellis will not allow claim payment for a date of loss occurring prior to the Plan Effective Date. Should the effective date come into question, the CMS may contact the Plan Master unit for clarification.

**See "Plan Master Transmittal Form"**

## Employee's Eligibility

Each time a claim is received, it is important that the employee's eligibility for disability coverage be verified. Even though an employee may have satisfied eligibility requirements for coverage at the time of enrollment, he/she may not satisfy eligibility requirements for benefit payment at the time of the claim.

Most plans specify that an employee must meet certain requirements before they can become covered under the group disability plan. These requirements may include:

1

Metropolitan Life Proprietary & Confidential Information

ML 0488

Employee.

**Eligibility Date:** July 1, 1998 or the date after you complete the
Eligibility Waiting Period, whichever is later."

The information concerning the length of the Eligibility Waiting Period
will also be contained in Plan Master.

In addition, the plan will specify the date that the coverage will
become effective following satisfaction of the Eligibility Waiting
Period. The benefits eligibility date can be:

- The eligibility date,
- The date the employee meets the active employee requirements, or
- The first of the month following the date eligible.

## Calculating the Eligibility Date

Using the date of hire and the applicable eligibility waiting period, the
CMS will calculate the date the employee should have been covered
and compare it against the employee's benefits eligibility date
provided by the employer. Any discrepancy must be clarified with the
employer and documented in a diary memo in Intellis.

**Example 1**
Employee's date of hire is 7/15/98. The eligibility waiting period
is 30 days. The effective date will be the day after the employee
completes the Eligibility Waiting Period. Therefore, the coverage
effective date is 8/14/98.

**Example 2**
Employee's date of hire is 7/15/98. The eligibility waiting period
is 30 days. The effective date will be the 1st of the month
following completion of the eligibility waiting period. Therefore,
the coverage effective date cannot be prior to 9/1/98.

## Active Employee/Actively at Work

Once it has been documented that the employee was in an eligible
class of employees and had met the eligibility waiting period, the
CMS must now determine if the employee was an Active Employee
on or after the intended effective date of coverage. Coverage for any
employee will not become effective on a date that they are not
Actively at Work because of a sickness or injury. In this event,
coverage will become effective on the first day that the employee is
Actively at Work in an eligible class.

The Active Employee / Actively at Work is defined in the plan under
the heading, "Active Employee" and may be illustrated as is in the

3                                          Metropolitan Life Proprietary & Confidential Information

ML 0487

MetLife Disability certificate series G.24303 below:

"**Active Employee**
You are an Active employee if you:

1. are an Eligible Employee working for the Employer doing all the material duties of your occupation at: (i) your usual place of business; or (ii) some other location that your Employer's business requires to be;
2. are a citizen or legal resident of the United States or Canada; and
3. are not a temporary or seasonal employee.

You will be deemed an Active Employee if:

1. you meet the above conditions; and
2. you are absent from work solely due to vacation days, holidays, scheduled days off, or approved leaves of absence not due to Disability."

> *Note: Although the definition of "Active Employee" may vary from plan to plan, the intent is to make certain that the employee is capable of work on the date that coverage becomes effective.*

**Continuity of Coverage Upon Replacement of Plans/Transfer of Insurance Carriers**

The intent of this provision is to guarantee that an employee does not suffer loss of coverage simply because of the transfer of insurance carriers. Continuity of coverage applies both to covered employees who are working and those who are already disabled. Continuity of coverage is mandated by some states.

If the employee was covered under the prior group plan, the employee will be covered under the MetLife Disability plan, subject to payment of premiums. However, some benefits may be reduced or denied.

- If the employee is disabled and receiving benefits under the prior group plan, the employee will not be covered under the MetLife Disability plan until they recover from the current disability and are an Active Employee with the employer.
- If the employee is disabled and notification of claim is submitted to MetLife Disability while they are eligible to receive benefits under the prior group plan, the employee will not be covered under the MetLife Disability plan. The employee will be covered under the MetLife Disability plan when they recover from the current disability and are an Active Employee with the employer. Under these circumstances, the CMS will:

  - Telephone the employer to explain the denial, advise that a letter will be sent to the

Metropolitan Life Proprietary & Confidential Information

ML0490

employee with a copy to the employer and instruct them to file the application for disability benefits with the prior carrier. If necessary, photocopy the claim documents to send to the employer.
- Telephone the employee and advise them as indicated above.
- Send the appropriate denial letter to the employee.
- Send a copy of the denial letter to the employer.
- Update the claim in Intellis using the appropriate "Inactive" and "Claim End Reason" descriptions.
- Use the diary heading of "Case Management, Coverage Verification" to indicate the non-coverage of the employee.
- Use the diary heading of "Outgoing Correspondence, Outgoing Correspondence" in Intellis to indicate that the denial letter sent to the employer and employee and/or other appropriate sources.
- Input the appropriate diary entry in Intellis

If the previous carrier does not assume liability, MetLife Disability may be able to provide benefits that are equal to the lesser of:

- The benefits the prior carrier would have paid; or
- The benefit payable under the MetLife Disability plan.

This type of continuity of coverage provision is often referred to as *"no loss/no gain"*.

Typically, if the employee is covered under the prior plan and the claim incurred date is prior to the MetLife Disability plan effective date, the employee will be eligible for benefits with the prior plan. However, there are two circumstances when MetLife Disability may pay benefits:

- If the prior plan's carrier has bankrupted; or

- When there is a dispute between the two carriers regarding the claim incurred date. In this situation, MetLife Disability may accept the claim so as not to penalize the employee, determine the proper incurred date and provide any disability benefits that are payable. If the incurred date is deemed to be prior to the MetLife Disability plan effective date, the CMS should refer the claim file to the unit manager and/or the Law Department for recommendations and assistance in pursuing acceptance of the claim by the prior carrier as well as reimbursement for any benefits paid to date by MetLife.

Refer to "Law Department Referral Form" in the Forms Database.

Under certain MetLife plan provisions, if the disabled employee is in the Elimination Period of the prior plan at the time of transfer of carriers, the portion of the Elimination Period that was completed under the prior plan will count toward completion of the Elimination Period under the MetLife plan.

    Metropolitan Life Proprietary & Confidential Information

ML0491

The Continuity of Coverage provision will also allow an employee to
carry forward:

- Any period of time satisfied toward an eligibility waiting period; or

- Time served toward satisfying the pre-existing condition limitation under the prior carrier.

> *In regard to Administrative Services Agreement (ASA) plans, the
> CMS should review the ASA plan provisions to verify if a Continuity
> of Coverage provision is included.*

### Reinstatement of Coverage

The Reinstatement of Coverage provision in the plan can affect coverage verification and the
determination of the employee's effective date of coverage. There may be impact on the eligibility
waiting period and the evidence of insurability requirement.

## Enrollment Period

The employee usually has a 31-day period from the date of eligibility for contributory coverage to sign
the enrollment form. If 31 days elapse and a form has not been completed, the employee is
considered a late entrant and must submit evidence of insurability in order to apply for coverage.

### See "Medical Underwriting and Statement of Health Unit"

### Flex Plans

Flex plans require employees to annually select the desired coverage(s). When determining whether
an employee is properly enrolled, the question that must be answered is did the employee sign the
enrollment form during the annual enrollment period? In other words, even though the employee must
select the type of coverage he/she prefers, the enrollment form still must be signed during the annual
enrollment period. It should be noted that some Flex plans permit coverages at specified benefit
levels to be "carried over" yearly without requiring an actual signature from the employee.

### Open Enrollment Periods

Occasionally, MetLife Disability and the employer may agree to hold an "open enrollment period."
During this time, employees who are not insured (but are members of an eligible class) are permitted
to enroll in the plan without having to submit evidence of insurability. Additionally, an open enrollment
period may take place if and when the coverage is transferred to a new carrier.

Open enrollment, other than at the transfer of carriers, is not a provision of the contract. It is an
agreement between the insurance company (specifically, the Underwriting Department) and the
employer. The purpose of open enrollment is usually to increase the percentage of employees
participating in the disability plan.

### Enrollment Form

Metropolitan Life Proprietary & Confidential Information

ML 049

**Non-contributory plans**

When an employer pays 100% of the premium, all employees who have fulfilled the eligibility requirements are covered. They are not required to complete an enrollment form. An employee will be eligible for non-contributory coverage on their benefits eligibility date. Therefore, if the plan is non-contributory, the CMS will not be required to obtain a copy of the enrollment form, or other enrollment verification. The benefits eligibility date provided by the employer should be compared with the date of hire and the eligibility waiting period.

**Contributory Plans**

In order for the employee's coverage to take effect under a contributory plan, the employee must have fulfilled the eligibility requirements and completed an enrollment form. The enrollment form must be signed prior to the end of the enrollment period. An enrollment form generally requests basic information such as the employee's:

- Full name
- Address
- Social security number
- Sex
- Date of birth
- Date of hire
- Occupation
- Work location or division
- Type of coverage(s) desired

If the employee does not desire coverage, he/she should complete the section of the enrollment form which indicates that he/she wishes to waive coverage.

**Non-Contributory vs. Contributory Plans**

Under non-contributory plans, the employer pays the entire premium for their employees' disability coverage. Contributory plans require that the employee pay a part or all of the premium for disability coverage. In some situations, the employer will pay for the basic or "core" disability plan while the employee will be required to pay for the enhanced or "buy-up" plan, if so elected. "Flex Plans" or "Cafeteria Plans" require the employee to choose the benefits they want from a group of coverages available through the Employee Benefit Plan. Often, the employer will contribute a specific amount toward the overall benefit plan for each employee. The number of coverages the employee chooses and the quality of those coverages (basic vs. enhanced) will determine the amount of additional premium the employee will be required to pay. The employee makes his selections during an annual enrollment period. If a disability plan is contributory, in whole or in part, the employee must complete an enrollment form requesting coverage and authorizing premium deduction.

The CMS must request, if not available, a copy of the enrollment form, or other type of verification, on all new claims in which the disability plan is contributory. The CMS must then verify that the enrollment form was signed during the enrollment period and that the employee requested disability coverage. In situations in which both basic and enhanced coverages are available, usually involving Flex plans, the CMS must verify that the employee requested the level of coverage under which they are now applying for benefits. For Flex plans, the CMS must also confirm that they have received the annual enrollment form for the benefit year in which the claim was incurred.

**Effective Date for Contributory Plans**

If the enrollment form was signed on or before the date the employee first becomes eligible for coverage, the employee's coverage will be effective on that date.

7

Employees who enroll for coverage during the 31 days after their eligibility date generally have coverage effective on the date the enrollment form was signed. The plan will specifically state when an employee's coverage becomes effective in relation to when the employee enrolled for coverage.

### Evidence of Insurability

Late entrants (employees who enroll more than 31 days after their eligibility date) must submit evidence of insurability. Disability coverage dependent upon evidence of insurability becomes effective on the date the enrollment form and proof of good health are approved by the Medical Underwriting Department. The medical underwriter will determine if the employee is an insurable risk based on MetLife's medical underwriting guidelines and the information provided on the statement of health provided by the employee, along with additional medical documentation, if necessary.

Once again, if evidence of insurability was submitted, the employee's effective date of coverage is the date that Medical Underwriting approved the application.

### Medical Underwriting and Statement of Health Unit

### Claim Contestability Period

In addition, the CMS should be aware of the standard, contractual two-year contestability period in regard to possible misrepresentation on the statement of health provided by the employee in situations requiring evidence of insurability. The CMS should refer to the specific provisions in the plan for further information regarding misrepresentation and the contestability period.

### Claim Contestability Period

## Coverage Verification Procedures

When a claim is received, the sequence of events should be:

1. Confirm that the employee is eligible for the benefits, then
2. Investigate the claim for merit. The CMS will review any information available and assess if initial contact with the employer and/or employee is necessary.

Therefore, preferably, the Coverage Verification process should be completed before extensive claim investigation, for merit, has taken place.

### Coverage Verification Requirements

No benefits should be released to the employee until it is confirmed that the employee is eligible to receive benefits. The CMS should obtain or access appropriate documentation of the employee's enrollment (e.g., enrollment card or inforce, etc.), and any other information needed to confirm coverage.

Coverage Verification is *required* on STD and LTD claims in the following situations:

- Contributory Plans
- Plans having a Preexisting Provision (regardless of the funding type, or if contributory or non-contributory)

Metropolitan Life Proprietary & Confidential Information

ML0494

- Plans having Buy-ups to the core plan
- Unusual eligibility requirements

**Example**

An employer offers a STD plan of 40% to all employees, but an employee can buy (up) an additional 20% by enrolling in the 20% buy-up plan. This is in addition to the "core" benefit of 40%, bringing the total coverage up to 60%. Since this is an optional benefit for the employee and enrollment is required, we have to determine that the employee is eligible for the additional benefit, i.e., properly enrolled for the buy-up portion of the coverage.

**Example**

The maximum benefit duration is based on the employee's years of service. The maximum benefit duration would be employee specific, and each claim submitted would need to be reviewed to determine the maximum length of time the employee would be eligible for benefits.

### Delays in Completing Coverage Verification

If there is difficulty completing the coverage verification process or the CMS determines that further assessment or information is needed to determine coverage and eligibility for benefits, the pertinent issue(s) should be documented in diary memo.

The CMS should:

1. Document, via diary memo, the status of verification and information outstanding.
2. Notify the employee that verification is pending receipt of certain information.
3. Proceed with the investigation to determine the merit of the claim.

When the Coverage Verification question has been resolved:

1. Document the outcome.
2. Inform the employee of the resolution. (The claim would be denied if the employee is not covered.)
3. Proceed with the claim investigation and determination process, if the employee is covered.

## Claim Documentation of Coverage Verification

The following describes the diary memo documentation requirements for coverage verification.

A diary memo entry is required for claims requiring investigation into issues concerning the employee's coverage. For easy identification, it is recommended that the diary memo have the header "Coverage Verification" which may be selected from the Intellis diary drop down list. As the issues are investigated and resolved, diary memo entries should be made to document the resolution.

If a claim is denied due to eligibility, the claim denial summary should document the rationale for the determination.

     Metropolitan Life Proprietary & Confidential Information

MLo4495

**Example 1:**
Coverage Verification
Need to confirm if Evidence of Good Health was submitted. Employee enrolled after expiration of open enrollment period.
Will contact employer for this information.


**Example 2:**
Coverage Verification
Need to investigate for pre-existing condition as disability occurred within first 12 months of coverage.

---

Note: If the date of disability falls within a plan's pre-existing limitation period, some type of notation should be included in the Coverage Verification diary indicating whether the provision will be investigated, or is not applicable.

Example: Pre-existing N/A.  Disability due to accident.

---

Metropolitan Life Proprietary & Confidential Information

ML0496

**000017 MetLife Claims Guidelines Palmiotti v MetLife**



**Created By:    Linda Boncek/Ins/MetLife/US        Date Created:        08/04/2000**

**Document Effective From:   02/01/2000     To:   12/01/2002**

**Are there prior versions of this document in Archive View?**     

**Please refer to the Archive View for prior versions of this document.**

# Claim Management Guidelines
## 7. Claim Investigation Process
### Chapter 2: Coverage Verification
#### Effective Date: 09/01/2000

## Introduction

Coverage verification is a basic requirement for all initial claim analysis. The CS/CM should be familiar with the eligibility provisions of the plan in order to be alert to any situation which may affect the eligibility of an employee. Eligibility information pertinent to the claim under review is entered into UDS / Intellis. Once input, the information will interface with Plan Master for confirmation of eligibility.

This chapter discusses some of the topics associated with employee's coverage and benefit eligibility.

> *Note:  As provisions related to employee eligibility may differ between disability plans, the CS/CM should carefully review and become familiar with the plan provisions that are pertinent to the claim under review.*

## Effective Date Of Disability Plan

The employee must be covered by a plan that is in effect on the date of disability.  No claim for benefits can be considered when it results from a disability beginning prior to the effective date of the plan.

The effective date of the plan will be indicated in Plan Master.  Intellis will not allow claim payment for a date of loss occurring prior to the Plan Effective Date.  Should the effective date come into question, the CS/CM may contact, the Plan Master unit for clarification.

**See "Plan Master Transmittal Form"**

## Employee's Eligibility

Each time a claim is received, it is important that the employee's eligibility for disability coverage be

1

Metropolitan Life Proprietary & Confidential Information

MLD477

verified. Even though an employee may have satisfied eligibility requirements for coverage at the time of enrollment, he/she may not satisfy eligibility requirements for benefit payment at the time of the claim.

Most plans specify that an employee must meet certain requirements before they can become covered under the group disability plan. These requirements may include:

- Being a member of an eligible class
- Satisfying an eligibility waiting period (also known as a service requirement with the employer)
- Being an Active Employee
- Completing an enrollment form during a defined enrollment period (for contributory plans)

The CS/CM should next review and compare the information contained on the Employer's Statement against the plan requirements for individual eligibility for coverage under the group disability plan. Was the employee covered under the plan at the time the claim was incurred?

## Eligible Employee/Eligible Class

Eligible class may be defined in a number of ways. Classifications may include, but are not limited to:

- Employee status (i.e., full time vs. part time, defined as working a set number of hours per week, exempt vs. non-exempt, union vs. non-union, salaried vs. hourly, etc.)
- Title (i.e., vice presidents, managers, account representatives)
- Location, division or subsidiary
- Salary level
- Length of service

The Employer's Statement and the Job Description will contain information necessary to document that the employee was in an eligible class of employees.

> Note: If there is a question as to whether an employee was a member of an eligible class it must be thoroughly investigated and documented in a diary memo on Intellis.

## Eligibility Waiting Period

The date of hire and the employee's benefits eligibility date should be compared against the plan's eligibility waiting period. The eligibility waiting period is the period of time that an employee must be employed before being eligible for coverage.

The eligibility waiting period is defined in the plan under the heading, "Employee Eligibility" and may be illustrated as is in the MetLife Disability certificate series G.24303 below:

### "Employee Eligibility

Eligible Employee: All hourly/salaried employees working at least 30 hours each week. However, if you do not have regular work hours you will be an Eligible Employee if you have worked at least an average of 30 hours per week during the preceding 12 calendar months (or during your period of employment if less than 12 months).

### Eligibility Waiting Period:

Metropolitan Life Proprietary & Confidential Information

MLD478

> Active Employees on July 1, 1998 :     None
>
>      Active Employees after July 1, 1998:     30 days of
> continuous service
>
>                                            as an Eligible
>
> Employee.
>
> **Eligibility Date:**   July 1, 1998 or the date after you complete the
> Eligibility Waiting Period, whichever is later."

The information concerning the length of the Eligibility Waiting Period
will also be contained in Plan Master.

In addition, the plan will specify the date that the coverage will
become effective following satisfaction of the Eligibility Waiting
Period. The benefits eligibility date can be:

- The eligibility date,
- The date the employee meets the active employee requirements, or
- The first of the month following the date eligible.

## Calculating the Eligibility Date

Using the date of hire and the applicable eligibility waiting period, the
CS/CM will calculate the date the employee should have been
covered and compare it against the employee's benefits eligibility
date provided by the employer. Any discrepancy must be clarified
with the employer and documented in a diary memo in Intellis.

**Example 1**
> Employee's date of hire is 7/15/98. The eligibility waiting period
> is 30 days. The effective date will be the day after the employee
> completes the Eligibility Waiting Period. Therefore, the coverage
> effective date is 8/14/98.

**Example 2**
> Employee's date of hire is 7/15/98. The eligibility waiting period
> is 30 days. The effective date will be the 1st of the month
> following completion of the eligibility waiting period. Therefore,
> the coverage effective date cannot be prior to 9/1/98.

## Active Employee/Actively at Work

Once it has been documented that the employee was in an eligible
class of employees and had met the eligibility waiting period, the
CS/CM must now determine if the employee was an Active
Employee on or after the intended effective date of coverage.
Coverage for any employee will not become effective on a date that
they are not Actively at Work because of a sickness or injury. In this

3                                       Metropolitan Life Proprietary & Confidential Information

MLo479

event, coverage will become effective on the first day that the
employee is Actively at Work in an eligible class.

The Active Employee / Actively at Work  is defined in the plan under
the heading, "Active Employee" and may be illustrated as is in the
MetLife Disability  certificate series G.24303 below:

### "Active Employee
You are an Active employee if you:

1.  are an Eligible Employee working for the Employer doing all
    the material duties of your occupation at: (i) your usual place
    of business; or (ii) some other location that your Employer's
    business requires to be;
2.  are a citizen or legal resident of the United States or
    Canada; and
3.  are not a temporary or seasonal employee.

You will be deemed an Active Employee if:

1.  you meet the above conditions; and
2.  you are absent from work solely due to vacation days,
    holidays, scheduled days off, or approved leaves of absence
    not due to Disability."

> Note:  Although the definition of "Active Employee" may vary
> from plan to plan, the intent is to make certain that the employee
> is capable of work on the date that coverage becomes effective.

### Continuity of Coverage Upon Replacement of Plans/Transfer of Insurance Carriers

The intent of this provision is to guarantee that an employee does
not suffer loss of coverage simply because of the transfer of
insurance carriers.  Continuity of coverage applies both to covered
employees who are working and those who are already disabled.
Continuity of coverage is mandated by some states.

If the employee was covered under the prior group plan, the
employee will be covered under the MetLife Disability plan, subject to
payment of premiums.  However, some benefits may be reduced or
denied.

*   If the employee is disabled and receiving benefits under the
    prior group plan, the employee will not be covered under the
    MetLife Disability plan until they recover from the current
    disability and are an Active Employee with the employer.
*   If the employee is disabled and notification of claim is
    submitted to MetLife Disability while they are eligible to
    receive benefits under the prior group plan, the employee will
    not be covered under the MetLife Disability plan.  The
    employee will be covered under the MetLife Disability plan
    when they recover from the current disability and are an

4                                               Metropolitan Life Proprietary & Confidential Information

MLO480

when they recover from the current disability and are an
Active Employee with the employer.  Under these
circumstances, the CS/CM will:

- Update the claim status on Intellis
- Telephone the employer to explain the
  denial, advise that a letter will be sent to the
  employee with a copy to the employer and
  instruct them to file the application for
  disability benefits with the prior carrier.  If
  necessary, photocopy the claim documents,
  return the originals to the employer and file
  the photocopy in the claim file
- Telephone the employee and advise them
  as indicated above
- Send the appropriate denial letter to the
  employee
- Send a copy of the denial letter to the
  employer
- Input the appropriate diary entry in Intellis

If the previous carrier does not assume liability, MetLife Disability
may be able to provide benefits that are equal to the lesser of:

- The benefits the prior carrier would have paid; or
- The benefit payable under the MetLife Disability plan.

This type of continuity of coverage provision is often referred to as
"no loss/no gain".

Typically, if the employee is covered under the prior plan and the
claim incurral date is prior to the MetLife Disability plan effective
date, the employee will be eligible for benefits with the prior plan.
However, there are two circumstances when MetLife Disability may
pay benefits:

- If the prior plan's carrier has bankrupted; or

- When there is a dispute between the two carriers regarding the claim incurral date.  In this
  situation, MetLife Disability may accept the claim so as not to penalize the employee,
  determine the proper incurral date and provide any disability benefits that are payable.  If the
  incurral date is deemed to be prior to the MetLife Disability plan effective date, the CS/CM
  should refer the claim file to the unit manager and/or the Law Department for
  recommendations and assistance in pursuing acceptance of the claim by the prior carrier as
  well as reimbursement for any benefits paid to date by MetLife.

See "Law Department Referral Form"

Under certain MetLife plan provisions, if the disabled employee is in the Elimination Period of the prior
plan at the time of transfer of carriers, the portion of the Elimination Period that was completed under
the prior plan will count toward completion of the Elimination Period under the MetLife plan.

The Continuity of Coverage provision will also allow an employee to
carry forward:

- Any period of time satisfied toward an eligibility waiting period; or

   Metropolitan Life Proprietary & Confidential Information

ML 48)

- Time served toward satisfying the pre-existing condition limitation under the prior carrier.

> In regard to Administrative Services Agreement (ASA) plans, the
> CS/CM should review the ASA plan provisions to verify if a
> Continuity of Coverage provision is included.

**Reinstatement of Coverage**

The Reinstatement of Coverage provision in the plan can affect coverage verification and the determination of the employee's effective date of coverage. There may be impact on the eligibility waiting period and the evidence of insurability requirement.

## Enrollment Period

The employee usually has a 31-day period from the date of eligibility for contributory coverage to sign the enrollment form. If 31 days elapse and a form has not been completed, the employee is considered a late entrant and must submit evidence of insurability in order to apply for coverage.

See "Medical Underwriting and Statement of Health Unit"

### Flex Plans

Flex plans require employees to annually select the desired coverage(s). When determining whether an employee is properly enrolled, the question that must be answered is did the employee sign the enrollment form during the annual enrollment period? In other words, even though the employee must select the type of coverage he/she prefers, the enrollment form still must be signed during the annual enrollment period. It should be noted that some Flex plans permit coverages at specified benefit levels to be "carried over" yearly without requiring an actual signature from the employee.

### Open Enrollment Periods

Occasionally, MetLife Disability and the employer may agree to hold an "open enrollment period." During this time, employees who are not insured (but are members of an eligible class) are permitted to enroll in the plan without having to submit evidence of insurability. Additionally, an open enrollment period may take place if and when the coverage is transferred to a new carrier.

Open enrollment, other than at the transfer of carriers, is not a provision of the contract. It is an agreement between the insurance company (specifically, the Underwriting Department) and the employer. The purpose of open enrollment is usually to increase the percentage of employees participating in the disability plan.

### Enrollment Form

#### Non-contributory plans

When an employer pays 100% of the premium, all employees who have fulfilled the eligibility requirements are covered. They are not required to complete an enrollment form. An employee will be eligible for non-contributory coverage on their benefits eligibility date. Therefore, if the plan

8

is non-contributory, the CS/CM will not be required to obtain a copy of the enrollment form, or other enrollment verification. The benefits eligibility date provided by the employer should be compared with the date of hire and the eligibility waiting period.

**Contributory Plans**

In order for the employee's coverage to take effect under a contributory plan, the employee must have fulfilled the eligibility requirements and completed an enrollment form. The enrollment form must be signed prior to the end of the enrollment period. An enrollment form generally requests basic information such as the employee's:

- Full name
- Address
- Social security number
- Sex
- Date of birth
- Date of hire
- Occupation
- Work location or division
- Type of coverage(s) desired

If the employee does not desire coverage, he/she should complete the section of the enrollment form which indicates that he/she wishes to waive coverage.

**Non-Contributory vs. Contributory Plans**

Under non-contributory plans, the employer pays the entire premium for their employees' disability coverage. Contributory plans require that the employee pay a part or all of the premium for disability coverage. In some situations, the employer will pay for the basic or "core" disability plan while the employee will be required to pay for the enhanced or "buy-up" plan, if so elected. "Flex Plans" or "Cafeteria Plans" require the employee to choose the benefits they want from a group of coverages available through the Employee Benefit Plan. Often, the employer will contribute a specific amount toward the overall benefit plan for each employee. The number of coverages the employee chooses and the quality of those coverages (basic vs. enhanced) will determine the amount of additional premium the employee will be required to pay. The employee makes his selections during an annual enrollment period. If a disability plan is contributory, in whole or in part, the employee must complete an enrollment form requesting coverage and authorizing premium deduction.

The CS/CM must request, if not available, a copy of the enrollment form, or other type of verification, on all new claims in which the disability plan is contributory. The CS/CM must then verify that the enrollment form was signed during the enrollment period and that the employee requested disability coverage. In situations in which both basic and enhanced coverages are available, usually involving Flex plans, the CS/CM must verify that the employee requested the level of coverage under which they are now applying for benefits. For Flex plans, the CS/CM must also confirm that they have received the annual enrollment form for the benefit year in which the claim was incurred.

**Effective Date for Contributory Plans**

If the enrollment form was signed on or before the date the employee first becomes eligible for coverage, the employee's coverage will be effective on that date.

Employees who enroll for coverage during the 31 days after their eligibility date generally have coverage effective on the date the enrollment form was signed. The plan will specifically state when an employee's coverage becomes effective in relation to when the employee enrolled for coverage.

7    Metropolitan Life Proprietary & Confidential Information

ML0483

an employee's coverage becomes effective in relation to when the employee enrolled for coverage.

**Evidence of Insurability**

Late entrants (employees who enroll more than 31 days after their eligibility date) must submit evidence of insurability. Disability coverage dependent upon evidence of insurability becomes effective on the date the enrollment form and proof of good health are approved by the Medical Underwriting Department. The medical underwriter will determine if the employee is an insurable risk based on MetLife's medical underwriting guidelines and the information provided on the statement of health provided by the employee, along with additional medical documentation, if necessary.

Once again, if evidence of insurability was submitted, the employee's effective date of coverage is the date that Medical Underwriting approved the application.

**Medical Underwriting and Statement of Health Unit**

**Claim Contestability Period**

In addition, the CS/CM should be aware of the standard, contractual two-year contestability period in regard to possible misrepresentation on the statement of health provided by the employee in situations requiring evidence of insurability. The CS/CM should refer to the specific provisions in the plan for further information regarding misrepresentation and the contestability period.

**Claim Contestability Period**

# Coverage Verification Procedures

When a claim is received, the sequence of events should be:

1. Confirm that the employee is eligible for the benefits, then
2. Investigate the claim for merit

Therefore, preferably, the Coverage Verification process should be completed before extensive claim investigation, for merit, has taken place.

**Coverage Verification Requirements**

No benefits should be released to the employee until it is confirmed that the employee is eligible to receive benefits. The CS/CM should obtain or access appropriate documentation of the employee's enrollment (e.g., enrollment card or Inforce, etc.), and any other information needed to confirm coverage.

Coverage Verification is *required* on STD and LTD claims in the following situations:

- Contributory Plans
- Plans having a Preexisting Provision (regardless of the funding type, or if contributory or non-contributory)
- Plans having Buy-ups to the core plan
- Unusual eligibility requirements

*Example*

8

ML 0184

An employer offers a STD plan of 40% to all employees, but an employee can buy (up) an additional 20% by enrolling in the 20% buy-up plan. This is in addition to the "core" benefit of 40%, bringing the total coverage up to 60%. Since this is an optional benefit for the employee and enrollment is required, we have to determine that the employee is eligible for the additional benefit, i.e., properly enrolled for the buy-up portion of the coverage.

*Example*

The maximum benefit duration is based on the employee's years of service. The maximum benefit duration would be employee specific, and each claim submitted would need to be reviewed to determine the maximum length of time the employee would be eligible for benefits.

### Delays in Completing Coverage Verification

If there is difficulty completing the coverage verification process or the CS/CM determines that further assessment or information is needed to determine coverage and eligibility for benefits, the pertinent issue(s) should be documented in diary memo.

The CS/CM should:

1. Document, via diary memo, the status of verification and information outstanding.
2. Notify the employee that verification is pending receipt of certain information.
3. Proceed with the investigation to determine the merit of the claim.

When the Coverage Verification question has been resolved:

1. Document the outcome.
2. Inform the employee of the resolution. (The claim would be denied if the employee is not covered.)
3. Proceed with the claim investigation and determination process, if the employee is covered.

### Initiation of STD Benefit Payments Pending Coverage Verification

Due to the urgency and the employee's immediate need for income during the STD period, if an STD coverage verification issue cannot be resolved within 2 days from the initiation of the attempt, the claim can be paid conditionally, if the employee is otherwise eligible for benefits. The conditional approval should not exceed one week of STD benefit payments.

The CS/CM should notify the unit manager prior to making this conditional approval and releasing any benefits.

The employee should be notified of the potential for overpayment if it is determined that he/she was not eligible to receive STD benefits. The employee notification should be done in writing, and the employee should be required to sign a Repayment Agreement.

If the subsequent resolution indicates that the employee was not eligible for benefits, payments should be immediately stopped; and we should initiate efforts to recover the money that was paid to the employee. The applicable **Overpayment Recovery Procedures** should be referenced for this information.

9

## Claim Documentation of Coverage Verification

The following describes the diary memo documentation requirements for coverage verification.

A diary memo entry is required for claims requiring investigation into issues concerning the employee's coverage. For easy identification, it is recommended that the diary memo have the header "Coverage Verification" which may be selected from the Intellis diary drop down list. As the issues are investigated and resolved, diary memo entries should be made to document the resolution.

If a claim is denied due to eligibility, the claim denial summary should document the rationale for the determination.

*Example 1:*
Coverage Verification
Need to confirm if Evidence of Good Health was submitted. Employee enrolled after expiration of open enrollment period.
Will contact employer for this information.

*Example 2:*
Coverage Verification
Need to investigate for pre-existing condition as disability occurred within first 12 months of coverage.

*Note: If the date of disability falls within a plan's pre-existing limitation period, some type of notation should be included in the Coverage Verification diary indicating whether the provision will be investigated, or is not applicable.*

*Example: Pre-existing N/A. Disability due to accident.*

Metropolitan Life Proprietary & Confidential Information

ML0486

**000027 MetLife Claims Guidelines Palmiotti v MetLife**

- Being a member of an eligible class
- Satisfying an eligibility waiting period (also known as a service requirement with the employer)
- Being an Active Employee
- Completing an enrollment form during a defined enrollment period (for contributory plans)

The CMS should next review and compare the information provided by the Employer against the plan requirements for individual eligibility for coverage under the group disability plan. Was the employee covered under the plan at the time the claim was incurred?

### Eligible Employee/Eligible Class

Eligible class may be defined in a number of ways. Classifications may include, but are not limited to:

- Employee status (i.e., full time vs. part time, defined as working a set number of hours per week, exempt vs. non-exempt, union vs. non-union, salaried vs. hourly, etc.)
- Title (i.e., vice presidents, managers, account representatives)
- Location, division or subsidiary
- Salary level
- Length of service

If the claim is submitted via paper the Employer's Statement and the Job Description will contain information necessary to document that the employee was in an eligible class of employees. If the claim is submitted telephonically by the Employee the CMS may need to call the Employer to obtain pertinent information.

> Note: If there is a question as to whether an employee was a member of an eligible class it must be thoroughly investigated and documented in a diary memo on Intellis.

### Eligibility Waiting Period

The date of hire and the employee's benefits eligibility date should be compared against the plan's eligibility waiting period. The eligibility waiting period is the period of time that an employee must be employed before being eligible for coverage.

The eligibility waiting period is defined in the plan under the heading, "Employee Eligibility" and may be illustrated as is in the MetLife Disability certificate series G.24303 below:

### "Employee Eligibility

Eligible Employee: All hourly/salaried employees working at least 30 hours each week. However, if you do not have regular work hours you will be an Eligible Employee if you have worked at least an average of 30 hours per week during the preceding 12 calendar months (or during your period of employment if less than 12 months).

### Eligibility Waiting Period:

| | |
|---|---|
| Active Employees on July 1, 1998 : | None |
| Active Employees after July 1, 1998: | 30 days of |
| continuous service | |
| | as an Eligible |

Metropolitan Life Proprietary & Confidential Information

ML 0987



**Created By:**    Linda Boncek/Ins/MetLife/US    **Date Created:**    02/26/2002

*Please refer to the Archive View for prior versions of this document.*

# Claim Management Guidelines
## 7. Claim Investigation Process
## Chapter 9: Medical Review
### Effective Date: 03/01/2002

## Introduction

The medical information obtained during the claim investigation is essential for the CS/CM to determine the nature, validity and potential duration of the claim under review.

Medical evidence from the Attending Physician may be obtained via the following methods:

- Physician interview
- Attending Physician Statement
- Physician narrative letter, office records, hospital discharge summaries, various diagnostic and laboratory test results, etc. (See "Note" below)

The medical documentation should provide the following information that is specific to the time period and nature of the disability under review:

- Specific medical diagnosis(es),
- Dates of initial and follow-up treatment,
- Treatment plan and prognosis for recovery or improvement,
- Documentation that continuing treatment is being provided to the employee,
- Documentation of the employee's symptoms and impairments that prevent him/her from performing work, and
- Information concerning the employee's retained abilities

> **Note:** *The CS/CM should only request the essential medical information that is necessary to make the claim determination or for ongoing claim management. Requests for extraneous information, such as complete hospital records or copies of the physician's entire office chart records, should be avoided unless that information is absolutely necessary for the for claim determination or management.*

The CS/CM should take care to only request the medical information that he or she feels is *essential* to make a claim determination or for ongoing claim management. Requesting additional medical information is *not* the best solution for claim management for the following reasons:

- It can be costly to both MetLife Disability and/or the customer to request unnecessary medical information.

1

ML0508

000025 MetLife Claims Guidelines Palmiotti V MetLife

- Frequently we may encounter delays in receiving the information because an outside service is used to photocopy the records, thus negatively affecting our ability to make a claim decision quickly.

- The additional medical documents may not answer the question or provide focus for future claim management. Office records usually only provide the chronological record of treatment, without adequately the employee's prognosis for medical improvement, current abilities, restrictions, and correlating these factors with the employee's return to work capacity.

If office records are needed to make the claim determination or for ongoing management, attention must be given so that only the specific records needed and for a specific time period are requested. By limiting our requests to the specific information that will resolve the question or issue, we will receive greater cooperation from the provider, incur less expenses and receive a more timely response.

In lieu of requesting routinely requesting offices records or other types of detailed medical information the CS/CM should:

- Determine the exact issue or question to be addressed with the medical provider,

- Draft specific questions the will obtain the necessary information to resolve the issue or question,

- If medical records must be requested, limit the request to the issue being considered, the time period in question, and pertinent to the disabling condition under review.

## Diagnosis

### Vague Diagnoses

The attending physician should provide a valid medical diagnosis. In the event that the physician has listed a vague or undefinable condition as the reason for disability, additional information should be requested from the physician to try and clarify the diagnosis before making a claim determination. Physician contact in such circumstances may be made by either the CS/CM or Nurse Consultant and preferably by phone to expedite the decision making process.

A vague diagnosis is that which:

- Provides only symptoms of a medical condition, rather than identifying the underlying disease, illness or injury, or
- Offers a general description of the dysfunction but fails to specifically define or code it within a medical classification listed in the above reference manuals.

The following list represents examples of medically vague conditions or terminology. This list is not all inclusive. Each may require additional clarification by the CS/CM before a claim decision may be made and the appropriate medical duration control guidelines applied.

*Note: Any additional information that is requested should be limited to the time period and nature of the disability under review.*

| Allergy | Headaches | Nervous tension |
| --- | --- | --- |
|  |  |  |

2

ML0509

| Anemia | Heart disease | Neuritis/Neuralgia |
|---|---|---|
| Anxiety | Insomnia | Pain (unspecified) |
| Arteriosclerosis | Jaundice | Palpitations |
| Arthralgia | Kidney disease | Paralysis |
| Back pain | Liver disease | Collapse |
| Lumbar strain/sprain | Swollen glands | Common cold |
| Lung disease | Syncope | Exhaustion |
| Menopause | Ulceration | Fatigue |
| Myalgia | Vascular disease | Gastrointestional disease |
| Nausea and/or vomiting | | |

Some diagnoses, although "valid" in that they are coded in the ICD-9 listings, will require additional clarification by the CS/CM because there may be several types or sub-classifications for these diagnoses. An example of this would be Arthritis which is further classified as Degenerative, Rheumatoid, Gouty, Traumatic, etc. It is important that the CS/CM determine what form or type of the diagnosis is related to the employee's medical condition because the recovery prognosis and disability duration may vary significantly.

**Diagnoses Indicating Possible Pre-existing Conditions**
Certain diagnoses may be chronic in nature and have potential implications for further investigation if the plan has a pre-existing condition limitation.

The following list illustrates examples of possible pre-existing diagnoses. Pre-existing diagnoses are not limited to the following:

- AIDS/HIV
- Allergies
- Arthritis
- Asthma
- Cancer (without clarification)
- Collagen disease
- Diabetes
- Epilepsy
- Gastritis
- Hypotension
- Hypertension
- Psychiatric disorders
- Sinusitis

Once again, the CS/CM can obtain clarification of the employee's medical diagnosis by telephone or written contact with the physician, or referral to the Nurse Consultant.

*Note: If additional information is needed, the request should be specific to the time period and nature of the disability under review.*

3                                                     Metropolitan Life Proprietary & Confidential Information

ML 0510

**Diagnoses and Claim Situations for Nurse Consultant Referral**

There are certain diagnoses or claim situations that may be difficult to quantify in terms of the employee's functional abilities and limitations.   These claims are initially routed to the Nurse Consultant (NC) for assessment and potential co-management.

The diagnoses and claims situations for Nurse Consultant referral include the following:

- Chronic Fatigue Syndrome,
- Fibromyalgia,
- Soft Tissue Disorders,
- Psychiatric Claims,
- Self Reported Diagnoses,
- Return to work with either modified or part-time work identified, or
- Expected disability exceeds the MetLife Disability STD Normal Duration Control Guidelines.

**ICD9 Coding for Chronic Fatigue Syndrome and Fibromyalgia**

To ensure consistent reporting and tracking of Chronic Fatigue Syndrome and Fibromyalgia claims, the following ICD9 codes should be used to identify these conditions:

- **Chronic Fatigue Syndrome        780.7**
- **Fibromyalgia                729.1**

*Note: The only exception to this guideline is if a physician has provided an ICD9 code for the employee's diagnosis that is different from those listed above. In this case we should use the code provided by the physician.*

**See " Guidelines for Administration of LTD Certificate Series G.24303 Limitations for Certain Medical Conditions"**

## Cause of Disability

The initial medical documentation provided by the attending physician should also include information regarding the cause of the disability. Inconsistencies often arise when there is the question whether the cause of disability pertains to a work-related illness or injury. If an occupational related disability, the subsequent Workers' Compensation benefits payable to the employee may be an offset  to the disability plan's benefit.  On the other hand, occupational causes of disability could be a plan exclusion. The CS/CM must evaluate the claim from this perspective.

**See "Plan Exclusions**

The determination of the cause of disability is important as STD plans can apply different waiting periods for disabilities due to illness versus accident. In addition, some STD plans provide first day benefit payments for injury/accident on the date that disability commences and/or hospital confinement beginning during the waiting period.

**See   MetLife Disability STD Certificate Series G.24303**

Finally, the disability plan may limit the duration benefits for certain medical conditions, such as mental and nervous conditions.

                                   Metropolitan Life Proprietary & Confidential Information

ML o5I)

See "Plan Limitations"

## Claim Incurral Date / Date Disability Commenced

The date that the employee becomes disabled is very important for the CS/CM to establish. It is used to determine when benefits will become payable if the claim is approved.

For STD, the claim incurral date (date disability commences) is used to establish when the waiting period, if applicable, will begin. For LTD, the claim incurral date is used to determine when the elimination period will begin.

When the plan has a pre-existing condition limitation provision, the claim incurral date becomes important when it falls within the time parameters defined by this provision. If the employee becomes disabled within the time-frame for this provision, the CS/CM should evaluate the employee's medical history prior to the date he/she became covered under the plan, in addition to evaluating the medical information for the current period the employee is unable to work.

> Note: The CS/CM should take care to be specific when requesting medical information during the pre-existing period so the request is limited to the time period being reviewed.

The date the disability began that is provided by the attending physician should correspond to the date that the medical data supports the employee's inability to perform his/her own occupation as defined by the plan.

Unfortunately, the attending physician may complete a claim form after asking the employee when he/she last worked and list the next day as the date the disability began. This date may not actually be accurate based upon the merits of the actual medical data. When questions arise about the relationship between the date disability began and the actual medical information, the CS/CM should contact the attending physician for clarification and further information.

The CS/CM may also want to refer the claim to the Nurse Consultant (NC) and/or Independent Physician Consultant for further review if questions remain.

The CS/CM should also verify that the date disability began provided by the physician is consistent with the information provided by the employee and employer. Any conflicts or discrepancies should be further investigated by the CS/CM for resolution.

## Care and Treatment

The information regarding the care and treatment the employee receives when first disabled is important in the determination of the claim incurral date.

This information, usually obtained by the CS/CM via the Attending Physician Statement or during the initial physician interview, can be critical to the claim decision. Some disability plans contain specific provisions regarding how soon following the last day worked the employee must seek medical treatment rendered by a licensed medical provider. This time requirement is usually 5-7 days. For plans that do not specifically include this time requirement, the CS/CM must use his/her judgment in the determination of the claim incurral date when there is a gap between the last day worked and the date of first medical treatment.

If information regarding care and treatment is not provided on the claim form or obtained

5                                    Metropolitan Life Proprietary & Confidential Information

ML0512

during the physician interview, the medical information is incomplete.

Information regarding care and treatment should include:

- Frequency and dates of treatment
- Nature of treatment

> **Note:** *If clarification of care and treatment is required, the CS/CM must be specific in the nature of the request so the exact issue or question can be resolved.*

**Appropriate Care and Treatment**
Disability plans generally have a provision that the employee must be receiving Appropriate Care and Treatment from a Doctor on a continuing basis. In order to determine if the treatment being rendered is appropriate, the CS/CM should also assess the severity of the medical condition claimed by the employee, as compared to the intensity and type of treatment that is actually being rendered. Any discrepancies should be discussed with the Nurse Consultant and possibly referred to the Independent Physician Consultant.

**Telephone Treatment**
As a general rule, telephone treatment does not satisfy the requirement that an employee must be under the care of a physician or licensed medical provider. However, there may be situations where initially the employee contacts the physician by phone to discuss his/her symptoms. The physician may prescribe medications or give the employee treatment instructions over the phone. This type of physician contact can be considered the date of first treatment. The CS/CM should contact the physician's office to obtain verification of the phone interaction. The     physician's office records would document the details of the phone conversation and any medications or treatments prescribed and may be requested if necessary for the claim determination.

While initial telephone treatment may be acceptable given the nature of the medical condition, ongoing medical treatment of this type would not satisfy the requirement that the employee must be under the regular care and treatment of a physician.

## Duly Qualified Physicians

Disability plans usually require that the employee receive care from a duly qualified physician or other recognized/licensed medical practitioner. Examples of other recognized medical providers may include, but are not necessarily limited to:

- M. D.
- D. O.
- Psychologist
- Chiropractor
- Podiatrist
- Master of Social Work (MSW)

The physician rendering treatment to the employee must operate within the scope of his/her license. This is a requirement for a valid proof of loss.

     Metropolitan Life Proprietary & Confidential Information

ML0513

An example of a physician not performing within the scope of his/her license would be a Podiatrist performing cardiac surgery.

Medical providers who are not licensed to render specific services may not verify disability for conditions requiring those types of treatment.

Many disability plans, which are governed by statutory regulations, specifically define what constitutes a duly qualified physician for the purposes of determining valid proof of loss. The CS/CM should be familiar with the applicable plan wording for the claim under review regarding the definition of a duly qualified physician or "Doctor".

Some states place limitations on the nature of services that may be rendered by chiropractors; all states have specific requirements for dentists, dental surgeons, social workers, nurse mid-wives, podiatrists and psychologists.

Some nurse practitioners may be accepted as duly qualified practitioners if the nurse practitioner's actions are under the guidance of a physician. Another factor that the CS/CM should consider when determining if a nurse practitioner's actions are considered appropriate treatment is to identify whether the medical carrier considers the nurse practitioner as an acceptable treatment provider.

The attending physician statement has an area where the medical provider may indicate his/her degree, specialty or license designation. If not indicated on the form, this information should be obtained when the CS/CM or Nurse Consultant conducts an initial physician interview.

In the event that the physician who is treating the employee for the disabling medical condition is not a specialist for that particular condition (for example, an employee with a psychiatric condition and the physician is a General Practitioner), the CS/CM should determine if an appropriate referral to a specialist has been made, including the date of the referral and the name and address of the consultant physician.

Early establishment of the fact that there is a duly qualified physician (including identification of the provider's areas of expertise) will enable the CS/CM and Nurse Consultant, if the claim is being co-managed, to assess the medical management issue of appropriate treatment.

## Subjective Symptoms

Subjective symptoms describe how an individual feels (pain, tired, weak, etc.). The symptoms that the employee describes have relevance to the diagnosis in that they should be consistent with the diagnosis provided by the attending physician.

However, subjective symptoms are not the same as a diagnosis. If the attending physician has only provided symptoms, the CS/CM should investigate further to determine the underlying diagnosis.

Symptoms may be used, however, as a source of additional validation that the stated diagnosis is accurate. If the stated diagnosis and symptoms are inconsistent, additional information should be requested from the attending physician before the CS/CM can render a disability determination.

*Note: If the CS/CM must clarify the employee's symptoms, the CS/CM direct specific questions to the physician to clarify the issue, or resolve the question.*

     Metropolitan Life Proprietary & Confidential Information

MLO514

## Objective Clinical Findings

Objective means measurable or observable. Objective clinical findings in the context of disability determination include various test results and radiological reports as well as the physician's examination findings. Along with the employee's subjective symptoms, these are the tools that the attending physician utilizes to make a diagnosis and to determine the severity of a medical condition.

There are times when the physician can make a diagnosis based upon the employee's subjective complaints. However, most medical conditions do require validation through clinical examination of the employee and/or medical tests and review of their results.

The clinical findings should support the subjective complaints of the employee. If the CS/CM encounters a situation where there is a discrepancy between the subjective complaints of the employee and the clinical findings, the CS/CM should try to resolve the discrepancy by contacting the attending physician for specific information to clarify and resolve the discrepancy, or by utilizing other claim investigation resources.

*Examples:*

The following are examples of situations that would require clarification:

- The employee states that he/she cannot work because of back pain. However, x-rays and MRI testing have been within normal limits.
- The employee states that he/she cannot work because of shortness of breath. However, the pulmonary function tests are within normal limits.

## Disability Duration Guidelines

The physician's prognosis indicates the physician's best estimate (based upon medical knowledge and expertise) of the employee's anticipated recovery period. This estimation takes into consideration:

- Potential for recovery
- Underlying conditions or complications
- Employee's age
- Severity of the diagnosis

Information about prognosis must be assessed in the context of the medical data and whether an employee performs sedentary, light, medium or heavy work.

The CS/CM should compare the physician's prognosis date for recovery to the MetLife Disability normal duration control guidelines for that specific diagnosis and work classification.

The MetLife Disability normal duration control guidelines are estimated time-frames (measured in days or weeks) when we could anticipate an employee to have recovered from the medical condition and return to work. The MetLife Disability normal duration control guidelines take into consideration the work classification in which the employee must perform.

*Example:*

8

ML 0575

An employee is disabled with a diagnosis of Lumbago: 742.2. If the employee performs sedentary work, the MetLife Disability Normal Duration for this particular diagnosis is 30 days. Subsequently, if the employee performs light work, the Normal Duration would be 30 days; medium work is 30 days; heavy work is 33 days; and very heavy work is 35 days.

The MetLife Disability Duration Control Guidelines are available on-line in the Intellis claim system by accessing the Medical Duration Factors window .

The CS/CM should compare the physician's prognosis and return to work date against the MetLife Disability duration control guidelines. If the physician's date for recovery and return to work exceeds the normal duration for that diagnosis/procedure and work classification, the CS/CM should contact the attending physician for further information. The CS/CM should also try to determine if the employee is experiencing any complications or other factors that would prevent the employee from returning to work as we would normally expect. The CS/CM should not approve benefits beyond the normal duration guidelines until this issue is resolved. Documentation to support payment of benefits beyond the normal guidelines should contain this information.

> *Note: If a MetLife Disability Duration Control Guideline is not identified, the CS/CM should consult the Presley Reed Duration Guidelines or Nurse Consultant.*

The Nurse Consultant (NC) referral criteria also allows for claims to be referred to the Nurse Consultant if it is anticipated that the employee's disability period will extend beyond the normal duration guidelines.

When the CS/CM assesses a claim for prognosis and return to work, he/she should also consider the employee's ability to perform "light duty" or some type of modified or part-time work. Benefits on a particular claim may be approvable based on medical duration guidelines for a "heavy" occupation. However, the employee may be capable of performing sedentary work. Many of our STD and LTD plans have special provisions for Rehabilitation Employment.

If the physician provides an actual return to work date and the employee does not return to work until after that date, the CS/CM should only consider disability up to the date the physician released the employee to return to work. Additional information from the employee, employer and/or physician would be required to consider extending disability beyond the original release to return to work date. An employee may decide to extend his/her absence from work at the conclusion of a disability period for personal reasons (i.e., Family Medical Leave Act in regard to pregnancy claims). In this situation, the disability benefits would not be extended.

## Determining Functional Ability

Assessment of the employee's functional status draws together the relationship of the employee's medical condition and any resulting impact it has upon the employee's ability to perform his/her job/occupation or an alternate occupation.

In assessing the medical data, the CS/CM must determine the employee's *abilities* as well as restrictions. Depending on the disability definition, the CS/CM must assess the employee's abilities and restrictions in conjunction with the requirements of:

- The employee's occupation with his/her current employer, or

Metropolitan Life Proprietary & Confidential Information

ML 0516

- The employee's occupation as performed by other employers, or
- Any occupation which the employee is qualified to perform.

*Example:*

An employee has been diagnosed with Adult Onset Diabetes. The diagnosis is validated by blood tests which show an elevated serum glucose level. The employee, despite being on daily insulin injections, continues to have a blood sugar level over 200. When the employee's blood sugar increases to this level, he/she experiences blurred vision and he/she has developed diabetic retinopathy with decreased visual acuity. The employee's occupation is a graphic artist. The essential duties of this occupation require being able to produce designs both manually drawn and also using a computer. This employee's impairment is reduced visual acuity. Comparing this impairment against the requirements of his/her occupation would result in the determination that the impairment would prevent the employee from performing that occupation.

*Note: If no functional limitations exist or if the occupational requirements do not exceed the employee's limitations, the employee would not be considered disabled in accordance with the plan.*

*Example:*

An employee has been diagnosed as having a disc bulge at L5-S1. This was confirmed via MRI studies. In addition, a Functional Capacity Evaluation (FCE) was performed which indicates that the employee cannot lift over 40 pounds. The employee works as an assembler of small electrical components. The employee's occupation requires that he/she lift 10 pounds on an occasional basis. Although the employee does have limitations, the requirements of the occupation do not exceed the restrictions and, therefore, should not prevent him/her from performing that particular occupation. This employee has the ability to perform the job of an assembler of small electric components.

For "any occupation" determinations, if the limitations do not prohibit the employee from performing an alternate gainful occupation, as described by the plan, for which he/she is qualified, the employee would also not be considered disabled. **See Transition Investigation**

*Note: When functional limitations are inconsistent with either the diagnosis or the medical data, the CS/CM should request only the specific information needed prior to making a claim determination.*

## Nurse Consultant Referral

The Nurse Consultant's (NC) function is to provide clinical assessment, facilitate return to work intervention and provide medical case management (when appropriate). The Nurse Consultant is a valuable resource to the CS/CM when assessing the employee's medical condition, potential for recovery, and other medical or treatment issues. The CS/CM should consult with the Nurse Consultant, as needed, to clarify or resolve medical issues that may arise for a given claim.

*Note: Generally, the Nurse Consultant does not have the ability, by plan design, to direct treatment or provide utilization review of medical treatment.*

ML0577

000038 MetLife Claims Guidelines Palmiotti v MetLife

**Nurse Consultant Resource**

## Policy Regarding MetLife Disability Payment for Medical Information

As it is the employee's responsibility to provide proof of his or her disability, as a standard practice MetLife Disability will not pay for the initial submission of medical information or for the periodic requests to the employee to provide ongoing proof of disability and eligibility for benefits. However, we should assume payment responsibility for medical reports or narratives requested directly to medical providers or other facilities by MetLife Disability. MetLife Disability's payment responsibility for such reports is limited to when the employee has complied with providing the initial proof and we deem the additional information necessary for claim development, especially in cases of possible claim denial or termination.

> *Example*
> - APS for initial Claim and periodic claim reinvestigations = Employee Payment Responsibility
> - AP Narrative, or specific medical reports requested for more detailed claim investigation = MetLife Disability Payment Responsibility

> *Note: Care should be given to request only the specific medical information needed. Specify the dates of treatment that are relevant to the claim (i.e., only medical records from the date of disability). This will help ensure that unnecessary costs are not incurred by the customer, employee, or MetLife Disability.*

> *Note: Any customer specific or other contractual requirements regarding payment for medical information would supersede this policy.*

## Referrals Requiring Review of Medical Information

To facilitate and expedite claim reviews that involve a review of medical information, the staff member making the referral should:

- Be specific and clearly document the issue or question that prompted the referral.

- Specifically indicate which portion of the medical information should be reviewed. The Document Control Number (DCN), including specific pages, should be provided if the medical information is imaged. If the medical information is contained in a paper claim file, the specific pages that should be reviewed should be clearly indicated or clipped for easy identification.

Metropolitan Life Proprietary & Confidential Information

ML0578

TOTAL P.43

000039 MetLife Claims Guidelines Palmiotti v MetLife



Created By:    Linda Boncek/Ins/MetLife/US        Date Created:        06/07/2001

Document Effective From:    07/01/2001    To:    03/01/2002

**Are there prior versions of this document in Archive View?**    

**Please refer to the Archive View for prior versions of this document.**

# Claim Management Guidelines
## 7. Claim Investigation Process
### Chapter 9: Medical Review
#### Effective Date: 07/01/2001

## Introduction

The medical information obtained during the claim investigation is essential for the CS/CM to determine the nature, validity and potential duration of the claim under review.

Medical evidence from the Attending Physician may be obtained via the following methods:

- Physician interview
- Attending Physician Statement
- Physician narrative letter, office records, hospital discharge summaries, various diagnostic and laboratory test results, etc. (See "Note" below)

The medical documentation should provide the following information that is specific to the time period and nature of the disability under review:

- Specific medical diagnosis(es),
- Dates of initial and follow-up treatment,
- Treatment plan and prognosis for recovery or improvement,
- Documentation that continuing treatment is being provided to the employee,
- Documentation of the employee's symptoms and impairments that prevent him/her from performing work, and
- Information concerning the employee's retained abilities

> *Note: The CS/CM should only request the essential medical information that is necessary to make the claim determination or for ongoing claim management. Requests for extraneous information, such as complete hospital records or copies of the physician's entire office chart records, should be avoided unless that information is absolutely necessary for the for claim determination or management.*

The CS/CM should take care to only request the medical information that he or she feels is *essential* to make a claim determination or for ongoing claim management. Requesting

1

Metropolitan Life Proprietary & Confidential Information

ML 0197

additional medical information is *not* the best solution for claim management for the following reasons:

- It can be costly to both MetLife Disability and/or the customer to request unnecessary medical information.

- Frequently we may encounter delays in receiving the information because an outside service is used to photocopy the records, thus negatively affecting our ability to make a claim decision quickly.

- The additional medical documents may not answer the question or provide focus for future claim management. Office records usually only provide the chronological record of treatment, without adequately the employee's prognosis for medical improvement, current abilities, restrictions, and correlating these factors with the employee's return to work capacity.

If office records are needed to make the claim determination or for ongoing management, attention must be given so that only the specific records needed and for a specific time period are requested. By limiting our requests to the specific information that will resolve the question or issue, we will receive greater cooperation from the provider, incur less expenses and receive a more timely response.

In lieu of requesting routinely requesting offices records or other types of detailed medical information the CS/CM should:

- Determine the exact issue or question to be addressed with the medical provider,

- Draft specific questions the will obtain the necessary information to resolve the issue or question,

- If medical records must be requested, limit the request to the issue being considered, the time period in question, and pertinent to the disabling condition under review.

## Diagnosis

### Vague Diagnoses
The attending physician should provide a valid medical diagnosis. In the event that the physician has listed a vague or undefinable condition as the reason for disability, additional information should be requested from the physician to try and clarify the diagnosis before making a claim determination. Physician contact in such circumstances may be made by either the CS/CM or Nurse Consultant and preferably by phone to expedite the decision making process.

A vague diagnosis is that which:

- Provides only symptoms of a medical condition, rather than identifying the underlying disease, illness or injury, or
- Offers a general description of the dysfunction but fails to specifically define or code it within a medical classification listed in the above reference manuals.

The following list represents examples of medically vague conditions or terminology. This list is not all inclusive. Each may require additional clarification by the CS/CM before a claim decision may be made and the appropriate medical duration control guidelines applied.

*Note: Any additional information that is requested should be limited to the time period and*

 Metropolitan Life Proprietary & Confidential Information

ML 0498

*nature of the disability under review.*

| Allergy | Headaches | Nervous tension |
|---------|-----------|-----------------|
| Anemia | Heart disease | Neuritis/Neuralgia |
| Anxiety | Insomnia | Pain (unspecified) |
| Arteriosclerosis | Jaundice | Palpitations |
| Arthralgia | Kidney disease | Paralysis |
| Back pain | Liver disease | Collapse |
| Lumbar strain/sprain | Swollen glands | Common cold |
| Lung disease | Syncope | Exhaustion |
| Menopause | Ulceration | Fatigue |
| Myalgia | Vascular disease | Gastrointestinal disease |
| Nausea and/or vomiting | | |

Some diagnoses, although "valid" in that they are coded in the ICD-9 listings, will require additional clarification by the CS/CM because there may be several types or sub-classifications for these diagnoses. An example of this would be Arthritis which is further classified as Degenerative, Rheumatoid, Gouty, Traumatic, etc. It is important that the CS/CM determine what form or type of the diagnosis is related to the employee's medical condition because the recovery prognosis and disability duration may vary significantly.

**Diagnoses Indicating Possible Pre-existing Conditions**
Certain diagnoses may be chronic in nature and have potential implications for further investigation if the plan has a pre-existing condition limitation.

The following list illustrates examples of possible pre-existing diagnoses. Pre-existing diagnoses are not limited to the following:

- AIDS/HIV
- Allergies
- Arthritis
- Asthma
- Cancer (without clarification)
- Collagen disease
- Diabetes
- Epilepsy
- Gastritis
- Hypotension
- Hypertension
- Psychiatric disorders
- Sinusitis

3

Metropolitan Life Proprietary & Confidential Information

ML0499

Once again, the CS/CM can obtain clarification of the employee's medical diagnosis by telephone or written contact with the physician, or referral to the Nurse Consultant.

> *Note: If additional information is needed, the request should be specific to the time period and nature of the disability under review.*

### Diagnoses and Claim Situations for Nurse Consultant Referral

There are certain diagnoses or claim situations that may be difficult to quantify in terms of the employee's functional abilities and limitations.   These claims are initially routed to the Nurse Consultant (NC) for assessment and potential co-management.

The diagnoses and claims situations for Nurse Consultant referral include the following:

- Chronic Fatigue Syndrome,
- Fibromyalgia,
- Soft Tissue Disorders,
- Psychiatric Claims,
- Self Reported Diagnoses,
- Return to work with either modified or part-time work identified, or
- Expected disability exceeds the MetLife Disability STD Normal Duration Control Guidelines.

### ICD9 Coding for Chronic Fatigue Syndrome and Fibromyalgia

To ensure consistent reporting and tracking of Chronic Fatigue Syndrome and Fibromyalgia claims, the following ICD9 codes should be used to identify these conditions:

- **Chronic Fatigue Syndrome**     780.7
- **Fibromyalgia**     729.1

> *Note:  The only exception to this guideline is if a physician has provided an ICD9 code for the employee's diagnosis that is different from those listed above. In this case we should use the code provided by the physician.*

See " Guidelines for Administration of LTD Certificate Series G.24303 Limitations for Certain Medical Conditions"

## Cause of Disability

The initial medical documentation provided by the attending physician should also include information regarding the cause of the disability.  Inconsistencies often arise when there is the question whether the cause of disability pertains to a work-related illness or injury.  If an occupational related disability, the subsequent Workers' Compensation benefits payable to the employee may be an offset  to the disability plan's benefit.  On the other hand, occupational causes of disability could be a plan exclusion.  The CS/CM must evaluate the claim from this perspective.

See "Plan Exclusions

The determination of the cause of disability is important as STD plans can apply different waiting periods for disabilities due to illness versus accident.  In addition, some STD plans provide first day benefit payments for injury/accident on the date that disability commences and/or hospital confinement beginning during the waiting period.

4

ML 2500

See   MetLife Disability STD Certificate Series G.24303

Finally, the disability plan may limit the duration benefits for certain medical conditions, such as mental and nervous conditions.

See "Plan Limitations"

## Claim Incurral Date / Date Disability Commenced

The date that the employee becomes disabled is very important for the CS/CM to establish.  It is used to determine when benefits will become payable if the claim is approved.

For STD, the claim incurral date (date disability commences) is used to establish when the waiting period, if applicable, will begin.  For LTD, the claim incurral date is used to determine when the elimination period will begin.

When the plan has a pre-existing condition limitation provision, the claim incurral date becomes important when it falls within the time parameters defined by this provision.  If the employee becomes disabled within the time-frame for this provision, the CS/CM should evaluate the employee's medical history prior to the date he/she became covered under the plan, in addition to evaluating the medical information for the current period the employee is unable to work.

> Note: The CS/CM should take care to be specific when requesting medical information during the pre-existing period so the request is limited to the time period being reviewed.

The date the disability began that is provided by the attending physician should correspond to the date that the medical data supports the employee's inability to perform his/her own occupation as defined by the plan.

Unfortunately, the attending physician may complete a claim form after asking the employee when he/she last worked and list the next day as the date the disability began.  This date may not actually be accurate based upon the merits of the actual medical data.  When questions arise about the relationship between the date disability began and the actual medical information, the CS/CM should contact the attending physician for clarification and further information.

The CS/CM may also want to refer the claim to the Nurse Consultant (NC) and/or Independent Physician Consultant for further review if questions remain.

The CS/CM should also verify that the date disability began provided by the physician is consistent with the information provided by the employee and employer.  Any conflicts or discrepancies should be further investigated by the CS/CM for resolution.

## Care and Treatment

The information regarding the care and treatment the employee receives when first disabled is important in the determination of the claim incurral date.

This information, usually obtained by the CS/CM via the Attending Physician Statement or during the initial physician interview, can be critical to the claim decision.  Some disability plans contain specific provisions regarding how soon following the last day worked the employee

Metropolitan Life Proprietary & Confidential Information

ML-0501

must seek medical treatment rendered by a licensed medical provider. This time requirement is usually 5-7 days. For plans that do not specifically include this time requirement, the CS/CM must use his/her judgment in the determination of the claim incurral date when there is a gap between the last day worked and the date of first medical treatment.

If information regarding care and treatment is not provided on the claim form or obtained during the physician interview, the medical information is incomplete.

Information regarding care and treatment should include:

- Frequency and dates of treatment
- Nature of treatment

> *Note: If clarification of care and treatment is required, the CS/CM must be specific in the nature of the request so the exact issue or question can be resolved.*

**Appropriate Care and Treatment**
Disability plans generally have a provision that the employee must be receiving Appropriate Care and Treatment from a Doctor on a continuing basis. In order to determine if the treatment being rendered is appropriate, the CS/CM should also assess the severity of the medical condition claimed by the employee, as compared to the intensity and type of treatment that is actually being rendered. Any discrepancies should be discussed with the Nurse Consultant and possibly referred to the Independent Physician Consultant.

**Telephone Treatment**
As a general rule, telephone treatment does not satisfy the requirement that an employee must be under the care of a physician or licensed medical provider. However, there may be situations where initially the employee contacts the physician by phone to discuss his/her symptoms. The physician may prescribe medications or give the employee treatment instructions over the phone. This type of physician contact can be considered the date of first treatment. The CS/CM should contact the physician's office to obtain verification of the phone interaction. The     physician's office records would document the details of the phone conversation and any medications or treatments prescribed and may be requested if necessary for the claim determination.

While initial telephone treatment may be acceptable given the nature of the medical condition, ongoing medical treatment of this type would not satisfy the requirement that the employee must be under the regular care and treatment of a physician.

## Duly Qualified Physicians

Disability plans usually require that the employee receive care from a duly qualified physician or other recognized/licensed medical practitioner. Examples of other recognized medical providers may include, but are not necessarily limited to:

- M. D.
- D. O.
- Psychologist
- Chiropractor

Metropolitan Life Proprietary & Confidential Information

ML0502

- Podiatrist
- Master of Social Work (MSW)

The physician rendering treatment to the employee must operate within the scope of his/her license. This is a requirement for a valid proof of loss.

An example of a physician not performing within the scope of his/her license would be a Podiatrist performing cardiac surgery.

Medical providers who are not licensed to render specific services may not verify disability for conditions requiring those types of treatment.

Many disability plans, which are governed by statutory regulations, specifically define what constitutes a duly qualified physician for the purposes of determining valid proof of loss. The CS/CM should be familiar with the applicable plan wording for the claim under review regarding the definition of a duly qualified physician or "Doctor".

Some states place limitations on the nature of services that may be rendered by chiropractors; all states have specific requirements for dentists, dental surgeons, social workers, nurse mid-wives, podiatrists and psychologists.

Some nurse practitioners may be accepted as duly qualified practitioners if the nurse practitioner's actions are under the guidance of a physician. Another factor that the CS/CM should consider when determining if a nurse practitioner's actions are considered appropriate treatment is to identify whether the medical carrier considers the nurse practitioner as an acceptable treatment provider.

The attending physician statement has an area where the medical provider may indicate his/her degree, specialty or license designation. If not indicated on the form, this information should be obtained when the CS/CM or Nurse Consultant conducts an initial physician interview.

In the event that the physician who is treating the employee for the disabling medical condition is not a specialist for that particular condition (for example, an employee with a psychiatric condition and the physician is a General Practitioner), the CS/CM should determine if an appropriate referral to a specialist has been made, including the date of the referral and the name and address of the consultant physician.

Early establishment of the fact that there is a duly qualified physician (including identification of the provider's areas of expertise) will enable the CS/CM and Nurse Consultant, if the claim is being co-managed, to assess the medical management issue of appropriate treatment.

## Subjective Symptoms

Subjective symptoms describe how an individual feels (pain, tired, weak, etc.). The symptoms that the employee describes have relevance to the diagnosis in that they should be consistent with the diagnosis provided by the attending physician.

However, subjective symptoms are not the same as a diagnosis. If the attending physician has only provided symptoms, the CS/CM should investigate further to determine the underlying diagnosis.

Symptoms may be used, however, as a source of additional validation that the stated diagnosis is accurate. If the stated diagnosis and symptoms are inconsistent, additional information should be requested from the attending physician before the CS/CM can render a

Metropolitan Life Proprietary & Confidential Information

ML0503

000040 MetLife Claims Guidelines Palmiotti V MetLife

disability determination.

> **Note:** If the CS/CM must clarify the employee's symptoms, the CS/CM direct specific questions to the physician to clarify the issue, or resolve the question.

## Objective Clinical Findings

Objective means measurable or observable. Objective clinical findings in the context of disability determination include various test results and radiological reports as well as the physician's examination findings. Along with the employee's subjective symptoms, these are the tools that the attending physician utilizes to make a diagnosis and to determine the severity of a medical condition.

There are times when the physician can make a diagnosis based upon the employee's subjective complaints. However, most medical conditions do require validation through clinical examination of the employee and/or medical tests and review of their results.

The clinical findings should support the subjective complaints of the employee. If the CS/CM encounters a situation where there is a discrepancy between the subjective complaints of the employee and the clinical findings, the CS/CM should try to resolve the discrepancy by contacting the attending physician for specific information to clarify and resolve the discrepancy, or by utilizing other claim investigation resources.

### Examples:

The following are examples of situations that would require clarification:

- The employee states that he/she cannot work because of back pain. However, x-rays and MRI testing have been within normal limits.
- The employee states that he/she cannot work because of shortness of breath. However, the pulmonary function tests are within normal limits.

## Disability Duration Guidelines

The physician's prognosis indicates the physician's best estimate (based upon medical knowledge and expertise) of the employee's anticipated recovery period. This estimation takes into consideration:

- Potential for recovery
- Underlying conditions or complications
- Employee's age
- Severity of the diagnosis

Information about prognosis must be assessed in the context of the medical data and whether an employee performs sedentary, light, medium or heavy work.

The CS/CM should compare the physician's prognosis date for recovery to the MetLife Disability normal duration control guidelines for that specific diagnosis and work classification.

The MetLife Disability normal duration control guidelines are estimated time-frames (measured

Metropolitan Life Proprietary & Confidential Information

ML0504

The MetLife Disability normal duration control guidelines are estimated time-frames (measured in days or weeks) when we could anticipate an employee to have recovered from the medical condition and return to work. The MetLife Disability normal duration control guidelines take into consideration the work classification in which the employee must perform.

**Example:**

An employee is disabled with a diagnosis of Lumbago: 742.2. If the employee performs sedentary work, the MetLife Disability Normal Duration for this particular diagnosis is 42 days. Subsequently, if the employee performs light work, the Normal Duration would be 46 days; medium work is 50 days; heavy work is 53 days; and very heavy work is 55 days.

The MetLife Disability Duration Control Guidelines are available on-line in the Intellis claim system by accessing the Medical Duration Factors window .

**See "Duration Control Guidelines**

The CS/CM should compare the physician's prognosis and return to work date against the MetLife Disability duration control guidelines. If the physician's date for recovery and return to work exceeds the normal duration for that diagnosis/procedure and work classification, the CS/CM should contact the attending physician for further information. The CS/CM should also try to determine if the employee is experiencing any complications or other factors that would prevent the employee from returning to work as we would normally expect. The CS/CM should not approve benefits beyond the normal duration guidelines until this issue is resolved. Documentation to support payment of benefits beyond the normal guidelines should contain this information.

> *Note: If a MetLife Disability Duration Control Guideline is not identified, the CS/CM should consult the Presley Reed Duration Guidelines or Nurse Consultant.*

The Nurse Consultant (NC) referral criteria also allows for claims to be referred to the Nurse Consultant if it is anticipated that the employee's disability period will extend beyond the normal duration guidelines.

When the CS/CM assesses a claim for prognosis and return to work, he/she should also consider the employee's ability to perform "light duty" or some type of modified or part-time work. Benefits on a particular claim may be approvable based on medical duration guidelines for a "heavy" occupation. However, the employee may be capable of performing sedentary work. Many of our STD and LTD plans have special provisions for Rehabilitation Employment.

If the physician provides an actual return to work date and the employee does not return to work until after that date, the CS/CM should only consider disability up to the date the physician released the employee to return to work. Additional information from the employee, employer and/or physician would be required to consider extending disability beyond the original release to return to work date. An employee may decide to extend his/her absence from work at the conclusion of a disability period for personal reasons (i.e., Family Medical Leave Act in regard to pregnancy claims). In this situation, the disability benefits would not be extended.

## Determining Functional Ability

Assessment of the employee's functional status draws together the relationship of the

Metropolitan Life Proprietary & Confidential Information

ML0505

000048 MetLife Claims Guidelines Palmiotti v MetLife

Assessment of the employee's functional status draws together the relationship of the employee's medical condition and any resulting impact it has upon the employee's ability to perform his/her job/occupation or an alternate occupation.

In assessing the medical data, the CS/CM must determine the employee's *abilities* as well as restrictions. Depending on the disability definition, the CS/CM must assess the employee's abilities and restrictions in conjunction with the requirements of:

- The employee's occupation with his/her current employer, or
- The employee's occupation as performed by other employers, or
- Any occupation which the employee is qualified to perform.

*Example:*
An employee has been diagnosed with Adult Onset Diabetes. The diagnosis is validated by blood tests which show an elevated serum glucose level. The employee, despite being on daily insulin injections, continues to have a blood sugar level over 200. When the employee's blood sugar increases to this level, he/she experiences blurred vision and he/she has developed diabetic retinopathy with decreased visual acuity. The employee's occupation is a graphic artist. The essential duties of this occupation require being able to produce designs both manually drawn and also using a computer. This employee's impairment is reduced visual acuity. Comparing this impairment against the requirements of his/her occupation would result in the determination that the impairment would prevent the employee from performing that occupation.

*Note: If no functional limitations exist or if the occupational requirements do not exceed the employee's limitations, the employee would not be considered disabled in accordance with the plan.*

*Example:*
An employee has been diagnosed as having a disc bulge at L5-S1. This was confirmed via MRI studies. In addition, a Functional Capacity Evaluation (FCE) was performed which indicates that the employee cannot lift over 40 pounds. The employee works as an assembler of small electrical components. The employee's occupation requires that he/she lift 10 pounds on an occasional basis. Although the employee does have limitations, the requirements of the occupation do not exceed the restrictions and, therefore, should not prevent him/her from performing that particular occupation. This employee has the ability to perform the job of an assembler of small electric components.

For "any occupation" determinations, if the limitations do not prohibit the employee from performing an alternate gainful occupation, as described by the plan, for which he/she is qualified, the employee would also not be considered disabled. **See Transition Investigation**

*Note: When functional limitations are inconsistent with either the diagnosis or the medical data, the CS/CM should request only the specific information needed prior to making a claim determination.*

## Nurse Consultant Referral

The Nurse Consultant's (NC) function is to provide clinical assessment, facilitate return to work intervention and provide medical case management (when appropriate). The Nurse Consultant

ML0506

is a valuable resource to the CS/CM when assessing the employee's medical condition, potential for recovery, and other medical or treatment issues. The CS/CM should consult with the Nurse Consultant, as needed, to clarify or resolve medical issues that may arise for a given claim.

> *Note: Generally, the Nurse Consultant does not have the ability, by plan design, to direct treatment or provide utilization review of medical treatment.*

**Nurse Consultant Resource**

## Policy Regarding MetLife Disability Payment for Medical Information

As it is the employee's responsibility to provide proof of his or her disability, as a standard practice MetLife Disability will not pay for the initial submission of medical information or for the periodic requests to the employee to provide ongoing proof of disability and eligibility for benefits. However, we should assume payment responsibility for medical reports or narratives requested directly to medical providers or other facilities by MetLife Disability. MetLife Disability's payment responsibility for such reports is limited to when the employee has complied with providing the initial proof and we deem the additional information necessary for claim development, especially in cases of possible claim denial or termination.

> *Example*
> - APS for Initial Claim and periodic claim reinvestigations = Employee Payment Responsibility
> - AP Narrative, or specific medical reports requested for more detailed claim investigation = MetLife Disability Payment Responsibility

> *Note: Care should be given to request only the specific medical information needed. Specify the dates of treatment that are relevant to the claim (i.e., only medical records from the date of disability). This will help ensure that unnecessary costs are not incurred by the customer, employee, or MetLife Disability.*

> *Note: Any customer specific or other contractual requirements regarding payment for medical information would supersede this policy.*

## Referrals Requiring Review of Medical Information

To facilitate and expedite claim reviews that involve a review of medical information, the staff member making the referral should:

- Be specific and clearly document the issue or question that prompted the referral.

- Specifically indicate which portion of the medical information should be reviewed. The Document Control Number (DCN), including specific pages, should be provided if the medical information is imaged. If the medical information is contained in a paper claim file, the specific pages that should be reviewed should be clearly indicated or clipped for easy identification.

Metropolitan Life Proprietary & Confidential Information

ML 0507